AO 93 (Rev. 12/09) Search and Seizure Warrant

FILED
TIME 1:26 PM
APR 11 2016
RICHARD W. NAGEL
Clerk of Court
CINCINNATI, OHIO

# UNITED STATES DISTRICT COURT
для the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The residence located at<br>97 Arlington Avenue<br>Franklin, Ohio 45005 | )<br>)<br>)  Case No. **1:16MJ-188**<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the ____Southern____ District of ____Ohio____
*(identify the person or describe the property to be searched and give its location)*:

    See Atachments A and B to the Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

    See Attachments A and B to Affidavit

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before ____4/25/16____
                                                                    *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10 p.m.    ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
____Karen L. Litkovitz____.
        *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30).*
                             ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: ____4/11/16 @ 1:20 p.m.____     *Karen L. Litkovitz*
                                                                    *Judge's signature*

City and state: ____Cincinnati, Ohio____        Karen L. Litkovitz, United States Magistrate Judge
                                                                             *Printed name and title*


GOVERNMENT EXHIBIT 1

*AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
Executing officer's signature

_____
Printed name and title

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
TIME 1:26 PM
APR 11 2016
RICHARD W. NAGEL
Clerk of Court
CINCINNATI, OHIO

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

The residence located at
97 Arlington Avenue
Franklin, Ohio 45005

) Case No. 1:16MJ-188
)
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A and B to the Affidavit.

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments A and B to the Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2241 | Aggravated Sexual Abuse of a Minor |

The application is based on these facts:

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

TFO Donald Minnich, FBI
Printed name and title

Sworn to before me and signed in my presence.

Date: 4/11/16

_____
Judge's signature

City and state: Cincinnati, Ohio

Karen L. Litkovitz, United States Magistrate Judge
Printed name and title

FILED
TIME 1:26 PM
APR 11 2016
RICHARD W. NAGEL
Clerk of Court
CINCINNATI, OHIO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

In the Matter of the Search of: )
)
The residence located at )  No. 1:16MJ -188
97 Arlington Ave. )
Franklin, Ohio 45005 )  Magistrate Judge
    and )
Vehicle identified as )  UNDER SEAL
White Ford Freestyle )
Ohio License EVT5914 )

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Donald J. Minnich, a Detective with the Hamilton County Sheriff's Office (HCSO) and a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state:

### I. EDUCATION TRAINING AND EXPERIENCE

1. I am a Detective with the HCSO and have been assigned as a TFO with the FBI since June of 2013. I am currently assigned to investigate matters involving the online exploitation of children and violent crimes against children in general, particularly in relation to violation of Title 18, United States Code (U.S.C.) §§ 2241 and similar offenses, which criminalize the aggravated sexual abuse of children, among other conduct. Prior to joining the FBI Task Force, I was a HCSO Deputy in Ohio for over 18 years. Since joining the FBI Task Force, I have received training and experience in these types of investigations. I have made arrests and have executed search warrants pertaining to these types of investigations.

2. During my career as a Detective and TFO, I have participated in various investigations involving the sexual exploitation of children, computer-related offenses and executed numerous search warrants to include those involving searches and seizures of computers, computer equipment, software, and electronically stored information. I have received both formal and

1

informal training in the detection and investigation of the sexual exploitation of minors, including aggravated sexual abuse and computer-related offenses. As part of my duties as a TFO, I investigate criminal violations relating to child exploitation, among other offenses, including aggravated sexual abuse, in violation of 18 U.S.C. § 2241.

3. As a TFO, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

## II. PURPOSE OF THE AFFIDAVIT

4. The facts set forth below are based upon my own personal observations, investigative reports, and information provided to me by other law enforcement agents. I have not included in this affidavit all information known by me relating to the investigation. I have set forth facts to establish probable cause for a search warrant for the residential property located at 97 Arlington Ave., Franklin, Ohio 45005 (the SUBJECT PREMISES) and for the vehicle described as a White Ford Freestyle, Ohio License Plate Number EVT5914 (the SUBJECT VEHICLE). I have not withheld any evidence or information which would negate probable cause.

5. The SUBJECT PREMISES and SUBJECT VEHICLE to be searched are more particularly described in Attachment B, for the items specified in Attachment A, which items constitute instrumentalities, fruits, and evidence of violations of 18 U.S.C. § 2241, the aggravated sexual abuse of a minor. I am requesting authority to search the entire SUBJECT PREMISES and SUBJECT VEHICLE, including the residential dwelling, all outbuildings and any computer, camera, and computer/camera media located therein where the items specified in Attachment A may be found, and to seize all items listed in Attachment A as instrumentalities, fruits, and evidence of crime.

## III. APPLICABLE STATUTE

6. Title 18, United States Code § 2241 makes it a crime to cross a state line with intent to engage in a sexual act with a person who has not attained the age of 12 years, or attempts to do so.

2

## IV. BACKGROUND REGARDING COMPUTERS

7. Computers are capable of storing and displaying photographs. The creation of computerized or digital photographs can be accomplished with several methods including using a "scanner," which is an optical device that can digitize a photograph. Another method is to simply take a photograph using a digital camera, which is very similar to a regular camera except that it captures the image in a computerized format instead of onto film. Such computerized photograph files, or image files, can be known by several file names including GIF (Graphic Interchange Format) files, or "JPG/JPEG" (Joint Photographic Experts Group) files.

8. Computers are also capable of storing and displaying movies of varying lengths. The creation of digital movies can be accomplished with several methods, including using a digital video camera (which is very similar to a regular video camera except that it captures the image in a digital format which can be transferred onto the computer). Such computerized movie files, or video files, can be known by several file names including "MPG/MPEG" (Moving Pictures Experts Group) files.

9. A computer's capability to store images in digital form makes it an ideal repository for the storage of image and movie files. A single floppy disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 100 gigabytes are not uncommon. These drives can store tens of thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and to save that image by storing it in another country. Once this is done, there is no readily apparent evidence at the scene of the crime. Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail. Searching computer systems and electronic storage devices may require a range of

3

data analysis techniques. Criminals can mislabel or hide files and directories, encode communications, attempt to delete files to evade detection, or take other steps to frustrate law enforcement searches. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

## V. SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

10. Searches and seizures of evidence from computers and cameras commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

   a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

   b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

11. In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU). In cases involving image or movie files where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the

4

analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media).

12. In addition, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, and modem are all instrumentalities or evidence of the crime detailed herein, and should all be seized as such.

### VI. SEARCH METHODOLOGY TO BE EMPLOYED

13. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

   a. Examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

   b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

   c. surveying various files, directories and the individual files they contain;

   d. opening files in order to determine their contents;

   e. scanning storage areas;

   f. performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and/or

   g. performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment A.

14. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily- available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not

actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

**VII. INVESTIGATION AND PROBABLE CAUSE**

15. Your Affiant was contacted by Detective Doug Todd from the HCSO in December of 2015, regarding an investigation involving the sexual abuse of two minor boys. Det. Todd advised your Affiant that two male juveniles, 10 and nine years of age (hereafter MV1 and MV2), had disclosed being sexually assaulted by JORY LEEDY (LEEDY). MV1 and/or MV2 stated the abuse took place over the course of two years and occurred in numerous jurisdictions and several different states. LEEDY met the minors through his volunteer work as a bus driver for Target Ministries of Dayton. LEEDY would go to poorer neighborhoods in the Dayton area and give rides to those who needed assistance from the ministry. LEEDY would also take the people back to their residents after the service was completed. LEEDY was determined by law enforcement to be a registered sex offender at the time he met the minors.

16. A summary of the investigation is as follows: The first contact MV1 and MV2 had with LEEDY was in the fall of 2012. MV1 was eight years old at the time. MV2 was seven years

6

old at the time of the first meeting with LEEDY. MV1 and MV2, along with their mother, rode the bus which LEEDY was driving, to the ministry on a Sunday. LEEDY showed an interest in the boys and after taking them back to their residence initiated a conversation with their family. The following couple of evenings LEEDY would stop by MV1 and MV2's residence and play with the boys and eat dinner with the family. They never saw LEEDY driving the church bus after the first meeting. The boys' father was living at the residence at the time.

17. LEEDY began coming over to the residence on a nightly basis. He told the mother of the boys that his name was JORDAN LEEDY. The mother did a search on a "Jordan Leedy" and nothing bad returned. LEEDY began buying the victims clothes and games. LEEDY made himself a part of their bedtime routine, tucking them in at night time. He would lay with them until they fell asleep and then would go home. A few weeks after meeting the family, LEEDY got permission from the mother to start taking the victims to his church, Crossroads, located in Cincinnati. The boys would be picked up every Sunday morning then dropped off later Sunday evening. LEEDY also began taking the victims on trips to the zoo, Kings Island, and other places for the day. LEEDY bought a new car for the family on April 29, 2013, a tan Buick.

18. In the summer of 2013, LEEDY asked the mother if he could start picking up MV1 and MV2 on Saturdays and staying in a hotel with them so they would be closer to Crossroads. Their mother approved, and for approximately every Saturday from the summer of 2013 until the summer of 2015, LEEDY would keep MV1 and MV2 overnight on Saturdays.

19. In March of 2014, LEEDY began taking MV1 and MV2 on trips out of state for vacations, which included trips to North Carolina, Georgia, and Kissimmee, Florida. Each time they took vacations only LEEDY and MV1 and MV2 went. No other adults stayed in the hotels with them. On June 28, 2014, they traveled to the New York/New Jersey Shore.

20. LEEDY helped MV1 and MV2 enroll in the East Dayton Christian School, at the beginning of the 2014 school year. In October 2014, LEEDY assisted the family in securing

7

another home which was owned by a friend of his. LEEDY paid for part of the rent. At one point, LEEDY attempted to convince the mother to execute a power of attorney which would give him control of the boys. LEEDY told the boys to call him "papa" and would get upset if they didn't.

21. On November 10, 2014, LEEDY took MV1 and MV2 to the Michael W. Smith concert, in Ashland, Kentucky. They spent a night in a hotel in Kentucky. The next trip out of state was when the victims were taken to Kitty Hawk, North Carolina, on April 9, 2015. They stayed in a hotel during this time. In the summer of 2015, LEEDY took MV1 and MV2 to Disney World. On the way to Florida they spent a night at a Motel 6, located at 742 Highway 53 East SE, Calhoun, Georgia 30701.

22. In September of 2015, LEEDY and the boys' father got into an argument because the father felt LEEDY was overstepping his bounds with the boys. The argument turned confrontational and LEEDY called the Fairborn Police. When law enforcement responded, they requested LEEDY leave the residence. The officer at the scene advised the parents of LEEDY's true identity and that he was a registered sex offender. Greene County Children Services was notified and forensic interviews were scheduled for MV1 and MV2, at Michael's House Child Advocacy Center

*Forensic Interviews*

23. MV2 was interviewed at Michael's House Advocacy Center in Fairborn, Ohio. The interview was conducted on September 18, 2015, by Cynthia Gevedon. MV2 stated that they met LEEDY on a church bus when they lived in Dayton. MV2 was seven years old at the time they first met LEEDY. LEEDY would come over to their house and play football and stay for grill outs. LEEDY took the boys to different hotels on the weekends. LEEDY took MV2 and MV1 to different places in Cincinnati, such as a Reds game and Crossroads Church. He also took them to Michigan, New York, Florida, Kentucky and Indiana.

8

24. Once while at a Motel 6, LEEDY climbed into the shower with MV2 and touched his private parts. MV1 was in the shower with LEEDY before MV2 got in. When they were in the shower everyone was naked. LEEDY always wanted to sleep in the bed with both boys. MV2 felt LEEDY tickle his private parts a couple times while they were sleeping. LEEDY would sleep between MV2 and MV1.

25. MV1 was interviewed at Michael's House Advocacy Center on September 18, 2015. The interview was conducted by Cynthia Gevedon. MV1 stated that he was in Cincinnati when LEEDY touched his private parts. LEEDY touched his penis and "booty" while they were in the shower. LEEDY slept between both boys. LEEDY touched MV1's "peni" on the outside and inside of clothing. MV1 has taken a bunch of showers with LEEDY in a bunch of states. LEEDY asked MV1 to touch his "wee-wee." LEEDY told MV1 not to tell anyone. MV1 also saw LEEDY touching MV2's "wee-wee" while MV2 was awake.

*Follow up Forensic Interviews*

26. After MV2 and MV1 disclosed more abuse to their mother, additional interviews were conducted at Michael's House Advocacy Center in Fairborn, Ohio. MV2 was interviewed on December 29, 2015, by Amy Ferguson. MV2 reiterated what he disclosed in the previous interview from September 18, 2015. MV2 stated that the first time they stayed in a hotel LEEDY put white cream on MV2 and MV1's penis.

27. MV2 disclosed that every time they stayed at a hotel, LEEDY would touch them. LEEDY would French kiss the boys, especially MV2. LEEDY began to suck on their privates when they were at the hotels.

28. MV2 said that every time they would go out of town, when they stopped at rest areas, LEEDY would wipe MV1's butt. While at a hotel out of town, LEEDY pushed MV2's head on the bed and tried to put his penis in MV2's butt. He stopped when it wouldn't fit. MV2 said that it hurt.

9

29. While at hotels, the boys and LEEDY would sit naked on the bed and massage each other's penises. MV2 said that almost every time LEEDY would make them put his penis in their mouth.

30. MV2 specifically remembers when they stayed at a hotel, LEEDY French kissed him and sucked on their penis.

31. MV1 was also interviewed at Michael's House Advocacy Center in Fairborn, Ohio, on December 29, 2015, by Amy Ferguson. MV1 reiterated what he disclosed in the previous interview from September 18, 2015. MV1 stated that every time LEEDY would take them to hotels, he would touch their privates. They would get in a circle on the bed and massage each other's privates. MV1 massaged LEEDY'S penis. LEEDY always wanted them to sleep in the bed naked. LEEDY liked to snuggle. Snuggling was described as them all being naked lying in the bed together and LEEDY would wrap his legs around them. LEEDY'S privates would touch them.

32. On the way to Florida they stayed at a hotel, LEEDY had MV1 and MV2 suck his penis. White stuff came out of LEEDY's penis and he put it on MV2's butt. LEEDY then sucked both the boys' privates. LEEDY tried to put his penis in MV1's butt, but it would not fit, so he stopped. MV1 said that it hurt. MV1 also saw LEEDY do this to his brother. MV1 said they had not had contact with LEEDY since their dad got into an argument with him.

33. LEEDY told MV1 and MV2 that if they told anyone of what happened in the hotels he would not be able to take them fun places anymore or buy games and clothes for them.

*Photographs and/or videos of trips*

34. The boys stated that LEEDY would often photograph and video them during the various trips they took. LEEDY made a video compilation which showed all the trips that he took with MV1 and MV2. The video was provided their mother on a compact disc. In addition, when contact was cut off between LEEDY and the boys, he emailed the video to a child protective

10

services employee in an attempt to show how well he treated the boys. The video has dates and locations where the trips were taken. LEEDY took photographs on the trips as well, which he sent to their mother using his cellular telephone.

*LEEDY's residence*

35. On or about April 1, 2016, your affiant did an RCIC database search on 97 Arlington Ave., Franklin, Ohio, 45005. The database search revealed that LEEDY is listed as a resident of the SUBJECT PREMISES.

36. On or about April 1, 2016, your affiant searched LEADS and learned that LEEDY listed the SUBJECT PREMISES as his address on his Ohio Driver's License. Further, a check of Bureau of Motor Vehicles records confirmed that LEEDY resides at the SUBJECT PREMISES and is the registered owner of a White Ford Freestyle, Ohio License Plate EVT5914. LEEDY has owned the SUBJECT VEHICLE since 05/19/2014. The mother of MV1 and MV2 confirmed LEEDY drove the SUBJECT VEHICLE to her home and that it was the automobile he would take on trips.

37. On April 1, 2016, at approximately 11:00 A.M., your affiant went to the SUBJECT PREMISES and observed a single family residence with white vinyl siding on the front. There were green shutters by the front windows. Your Affiant also observed a white Ford Freestyle with Ohio License Plate EVT5914, parked in the driveway of the SUBJECT PREMISES.

11

## VIII. CONCLUSION

38. Based on the aforementioned factual information, your affiant submits there is probable cause to believe that violation of Title 18, United States Code, § 2241 has been committed, and evidence of those violations is located in the residence and vehicle described in Attachment B. Your affiant respectively requests that the Court issue a search warrant authorizing the search and seizure of the items described in Attachment A.

																		_____
																		Donald Minnich
																		Detective/TFO
																		Hamilton County Sheriff Office/FBI

Sworn to and subscribed before me this 11th day of April 2016.

_____
HON. KAREN L. LITKOVITZ
United States Magistrate Judge
Southern District of Ohio

## ATTACHMENT A
## LIST OF ITEMS TO BE SEIZED

1. Computer(s), computer hardware (including but not limited to central processing units; internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives, diskettes, and other memory storage devices), computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be used to create or store image and video files.

2. Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

3. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the travel of LEEDY described in the Affidavit.

4. In any format and medium, all originals, computer files, copies, and negatives of photographs or videos taken on trips described in the Affidavit.

5. Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the operator of the computer, or by other means for the purpose of arranging or documenting the trips described in the Affidavit.

6. Any and all records, documents, invoices and materials, in any format or medium that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

7. Any and all files, documents, records, or correspondence, in any format or medium (including, but not limited to, network, system, security, and user logs, databases, software registrations, data and meta data), that concern user attribution information.

8. Any and all cameras, film, videotapes or other photographic equipment.

9. Any and all visual depictions of minors in order to compare the images to known and identified minor victims of sexual exploitation.

10. Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic

13

messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

11. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors.

## ATTACHMENT B
## DESCRIPTION OF PLACES TO BE SEARCHED

The address 97 Arlington Avenue, Franklin, Ohio, 45005, is a single family residence. There is white vinyl siding on the front of the residence. There are green colored shutters by the front windows. There is a mailbox by the roadway in front of the residence that has the numbers "97" on it. (See photo below)

The automobile is described as a White Ford Freestyle, bearing Ohio license plate number EVT5914.




15