# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:16-cr-036 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| JORY LEEDY, | : | |
| | : | |
|     Defendant. | : | |

## ORDER DENYING DEFENDANT'S
## MOTION FOR RECONSIDERATION

This criminal case is before the Court on Defendant's motion for reconsideration of the Court's Order denying Defendant's motion to dismiss. (Doc. 48). The Court also has before it the Government's response in opposition (Doc. 61), Defendant's reply (Doc. 65), and Defendant's post-hearing supplemental brief (Doc. 74). The Court held a hearing on Defendant's motion on March 9, 2017. (Doc. 73).

## I. BACKGROUND

### A. Procedural Posture

On April 20, 2016, Defendant Jory Leedy was charged by way of Indictment with two counts of aggravated sexual abuse of a child under the age of twelve, in violation of 18 U.S.C. § 2241(c). (Doc. 11). A superseding indictment, filed on December 21, 2016, added one additional count of the same offense. (Doc. 51).

Following the original indictment, the Court established a pretrial calendar, which included, *inter alia*, a discovery deadline of May 13, 2016. (Doc. 18). The Government

timely made its initial production of discovery, which defense counsel promptly reviewed. (Doc. 36 at 1).

On May 24, 2016, defense counsel requested supplemental discovery from the Government. (Doc. 43 at 4). Only one of those requested items remains at issue today. Specifically, defense counsel asked the Government to provide a copy of a document that was shown to the minors prior to their forensic interviews. (*Id*. at 3-4). The document, which the minors referenced during their interviews, apparently contained information relating to Defendant's prior convictions. (*Id*.)

Initially, the Government responded to defense counsel's request and indicated that it would obtain the document for Defendant, albeit with some delay because the lead detective was on vacation. (*Id*. at 4). However, the document was never received.

Over the next few months, defense counsel continued to contact the prosecutor regarding the status of the document and was assured that it was forthcoming. (*Id*. at 4-5; Doc. 36 at 1-2). But, having receiving nothing by August 2016, defense counsel filed a motion to compel discovery. (Doc. 25). The Court granted Defendant's motion for discovery on November 7, 2016. (Doc. 37).

On November 8, 2016, the Government filed a Notice stating that the requested document was a Sheriff's Office printout regarding Defendant's status as a registered sex offender. (Doc. 40). The Government informed defense counsel that the document was publicly available on the Sheriff's website. (Doc. 43 at 6).

Defense counsel maintained that the Government's response was insufficient and continued to request the actual document shown to the minors. (*Id*.) On November 14,

2016, the Government responded that while the information on the Sheriff's website is likely what the minors were shown, the Government was working to arrange a meeting with the interviewers to "double check with them in person about what the boys would have been referencing." (Doc. 43-1, ¶ 11).

On November 17, 2016, Defendant filed a motion to dismiss, arguing that the Government's failure to provide the requested document amounted to prosecutorial misconduct and violated Defendant's right to due process. (Doc. 43). The Court held a status conference on November 21, 2016, during which the Court established a briefing schedule for the motion. (Doc. 47). However, the Court agreed that no responsive memoranda would be required if the Government immediately obtained and provided the document at issue. (*Id*. at 14-15).

On November 22, 2016, the Government sent an email (including attachments) to defense counsel, with copy to the Court, stating:

> At the government's request, the administrative worker at Green County JFS went through the file related to Minors 1 and 2 and found the attached additional documents, which were provided to the United States on today's date. As you can see, these documents are highlighted, as referenced by one of the boys during his interview. I believe this completes the defense's request related to this issue and fully complies with the Court's order. Please confirm whether you agree.

(Email, Nov. 22, 2016; Doc. 48, Ex. 1).

By the next day, the Court had not received a reply email or any indication of objections from the defense. The Court therefore assumed the production was satisfactory and thus issued the following notation order the afternoon of November 23:

> NOTATION ORDER:  As the Government recently obtained and provided Defendant with a copy of the outstanding item of additional discovery, the need for further briefing on Defendant's motion to dismiss (Doc. 43) is MOOT.  The Court will issue a written decision by separate entry.  IT IS SO ORDERED.

(Notation Order, Nov. 23, 2016).

Five days later, on November 28, 2016, the Court issued an Order denying the motion to dismiss and *sua sponte* granting Defendant leave to file any supplemental memoranda, or additional pretrial motions, based on the recently received discovery. (Doc. 46).

In the Order denying Defendant's motion to dismiss, the Court believed that the Government had in fact prolonged production of the requested discovery, which production, <u>by all appearances</u>, was ultimately satisfied in one day.  Again, this belief was based on the Court's assumption that the Government's production of November 22, 2016 was satisfactory, given that the Court received no response or objection from the defense to either the Government's email or to the Court's subsequent notation order.

Unbeknownst to the Court, however, Defendant did <u>not</u> agree that the document obtained by the Government satisfied the production request.  As the Court would later learn, defense counsel had in fact replied to the Government's email and voiced objection, but defense counsel had not included the Court on that reply.  (Doc. 48, Ex. 2 at 1).  Defendant's objection email was sent on November 23, 2016—a few hours before the Court issued its notation order, which notation order declared briefing to be moot and stated that the Court would enter an Order on Defendant's motion.  (*Id*.)  Thus, unaware

of defense counsel's email objection, and having received no clarification from either party after entering the November 23, 2016 notation order, the Court proceeded to rule on the motion to dismiss, based on the information before it.

Three weeks later, on December 19, 2016, Defendant filed the instant motion for reconsideration of the Order denying the motion to dismiss. (Doc. 48). It was only upon review of the instant motion that the Court first learned defense counsel had objected to the Government's November 22, 2016 email production.

In his motion for reconsideration, Defendant explains that while he did object to the Government's production, the parties attempted to resolve the outstanding discovery issue without the Court's involvement. (*Id.* at 3-4). To that end, the prosecutors, defense counsel, and the task force officer met on November 29, 2016 (*i.e.*, one day after the Court entered its order denying the motion to dismiss) at the U.S. Attorney's Office in Cincinnati, Ohio. (*Id.* at 4; Doc. 46).

On December 9, 2016, the prosecutors, defense counsel, and task force officer held another meeting, this time with the original caseworker, Alina Whittaker, in attendance as well. (Doc. 48 at 4). The December 9, 2016 meeting with Ms. Whittaker was held at the U.S. Attorney's Office in Dayton, Ohio. (*Id.*) At the meeting, Ms. Whittaker clarified that the documents the Government provided on November 22, 2016 were <u>not</u> the documents she had in her possession during her visit to the minors' home, and that she had since shredded the actual documents. (*Id.*)

Given the delays in learning the fate of the documents, as well as their confirmed destruction, Defendant argues in his motion for reconsideration that this case presents a

"unique combination of persistent government misconduct and spoliation of evidence," which hinders his ability to obtain a fair trial. (*Id*. at 6).

On March 9, 2017, the Court held a hearing on Defendant's motion for reconsideration. (Doc. 73). During the hearing, the Court received evidence from the parties and heard testimony from three witnesses called by the defense: (1) former Greene County Department of Job and Family Services ("GCJFS") caseworker, Alina Whittaker; (2) Hamilton County Sheriff's Detective Douglas Todd; and (3) Hamilton County Sheriff's Detective and FBI Task Force Officer Donald Minnich. (*Id*.)

### B. Facts

#### 1. *Testimony of Alina Whittaker*

Alina Whittaker was employed as a Children's Services caseworker at GCJFS from October 2014 until December 2015. (Doc. 73 at 20). Ms. Whittaker was involved in the investigation of new reports, such as neglect or abuse cases. (*Id*. at 21).

In September 2015, Ms. Whittaker was assigned to an investigation involving the minors in this case.[1] (*Id*.) Specifically, Ms. Whittaker received a report regarding a domestic violence incident between Defendant and the minors' father. (*Id*. at 34).[2] The report stated that on September 14, 2015, Defendant and the minors' father had a dispute

---

[1] To protect their identities, the minors were referred to as "Minor 1" and "Minor 2" throughout the hearing, and have been identified as such in the Government's Victim Identification Chart. (Doc. 72). For purposes of this Order, the Court will continue to refer to the minors as "Minor 1" and "Minor 2," and, collectively, the "minors."

[2] Ms. Whittaker testified that she does not know who provided the information contained in the report, as reporter information is kept confidential. (Doc. 73 at 35).

over how much time Defendant was spending with the minors. (*Id*.) The police were called to the scene of the dispute. (*Id*.) Ultimately, the police notified the minors' parents that Defendant was a registered sex offender. (*Id*.)

Upon receiving the report, Ms. Whittaker and another caseworker, Maria Sostrom, went to the minors' home to speak with the parents. (*Id*. at 22). During the home visit, Ms. Whittaker had in her possession a file containing standard paperwork, including a copy of Defendant's criminal record, the minors' parents' criminal histories, the case report, general safety assessment questions, and a demographic sheet. (*Id*. at 23, 26). Ms. Whittaker testified that it is customary practice for caseworkers to bring these types of documents when they go on home visits. (*Id*. at 22-23). Additionally, in this case, because Defendant was a registered sex offender, Ms. Whittaker had a copy of Defendant's sex offender registry print-out, which a GCJFS "screener" obtained for her from the public database maintained online by the Sheriff's Office. (*Id*. at 24-25).

Apart from the standard paperwork, Ms. Whittaker testified that the file included her own handwritten notes regarding the report, which she had written on an otherwise blank piece of computer paper. (*Id*. at 26-27). Ms. Whittaker stated that she had also highlighted pertinent information on all of the criminal history print-outs, such as the individuals' names and any relevant offenses. (*Id*. at 27). On Defendant's criminal history, Ms. Whittaker had highlighted his prior sex offense. (*Id*.) Ms. Whittaker testified that none of the paperwork in her possession provided details about Defendant's prior offenses (*e.g.*, the age of the victim or any specifics regarding the conduct), beyond merely stating the charges. (*Id*. at 27-28).

The minors and their parents were home when Ms. Whittaker arrived for the home visit. (*Id*. at 29). Intending to speak with the parents in private, Ms. Whittaker asked the parents to have the minors leave the room. (*Id*.) The parents refused. (*Id*.) Ms. Whittaker proceeded to speak with the parents while the minors were present but seated at the opposite end of the living room. (*Id*. at 31-32). Throughout the visit, Ms. Whittaker took notes on her conversation with the parents, which she wrote down on Defendant's Sex Offender registry print-out. (*Id*. at 74-76).

Ms. Whittaker testified that she told the parents that Defendant was a registered sex offender, but she did not say anything further about Defendant's criminal history, as she had no other information to provide. (*Id*. at 29-30). Ms. Whittaker specifically denied reading any of the highlighted portions of the paperwork to the minors and stated that all paperwork referencing Defendant's criminal history remained in her file and away from view. (*Id*. at 32-33).

As of the date of this home visit, there were no allegations that the minors had been sexually abused. (*Id*. at 37). To be sure, Ms. Whittaker and the parents discussed scheduling the minors for forensic interviews. (*Id*. at 36-37). Ms. Whittaker also reported the case to the Fairborn Police Department. (*Id*. at 49).

Immediately after the initial home visit, Ms. Whittaker returned to her office and input her notes into a designated computer program used by Children's Services to document all interactions with families involved in active cases. (*Id*. at 36). Ms. Whittaker also retained the hard-copies of her own notes. (*Id*.) Ms. Whittaker then arranged for the minors to have their forensic interviews on September 18, 2015 at

"Michael's House," which is the GCJFS's child advocacy center in Fairborn, Ohio. (*Id.* at 38).

On September 16, 2015—prior to the forensic interviews—Ms. Whittaker returned to the minors' home with another caseworker, Casey Slater, as well as police officers from the Fairborn Police Department. (*Id.* at 40). This second visit was prompted by concerns that the minors' parents had known for several months that Defendant was a registered sex offender and had nonetheless allowed Defendant to have access to their children. (*Id.* at 40-43).

Ms. Whittaker stated that, prior to the second home visit, she had obtained additional information regarding Defendant's criminal history by conducting a Google search of Defendant's name. (*Id.* at 44). Ms. Whittaker testified that her search revealed a Court of Appeals decision, issued as to Defendant's prior state criminal case, which decision contained details of his prior state court offense. (*Id.* at 45-47; Doc. 48-2; Def. Ex. 1).

Ms. Whittaker confirmed that she kept a printed copy of the appellate decision in her case file, along with the initial paperwork, all of which she had in her possession when she conducted the second visit to the minors' home. (Doc. 73 at 44-47). However, Ms. Whittaker maintained that she did not show the appellate court decision to the minors' parents during the second home visit. (*Id.*) Moreover, Ms. Whittaker testified that she had little to no contact with the minors that day, nor did she read or otherwise

disclose any details regarding Defendant's prior offense to either the minors or their parents. (*Id*.)[3]

On September 18, 2015, Ms. Whittaker was present for the minors' first forensic interviews at Michael's House. (*Id*. at 48). Prior to the interview, Ms. Whittaker met with the forensic interviewer, Cynthia Gevedon, to discuss the concerns at issue in the case. (*Id*.) When the forensic interviews started, Ms. Whittaker watched on a computer monitor in the next room. (*Id*. at 49).

During the interview, Minor 2 repeatedly told Ms. Gevedon that Ms. Whittaker had, while in his presence, read the highlighted portions of a document, which document apparently contained detailed information regarding Defendant's prior offense. (*Id*. at

---

[3] Ms. Whittaker testified that the documents in Defense Exhibit 1 (Doc. 48-2)—*i.e.*, a print-out of Defendant's criminal history from JusticeWeb, as well as the appellate court decision—are in fact two of the highlighted documents from her case file. (Doc. 73 at 44-45).

However, later in her testimony, it was noted that, along the bottom of the JusticeWeb document, there is a 'printed on' date of September 23, 2015. (*Id*. at 71-72). If accurate, this print date would evidence that Ms. Whittaker could not have possessed the JusticeWeb print-out prior to the first forensic interview, which took place on September 18, 2015 (*i.e.*, five days prior to the print date).

The Court finds the 'printed on' date misleading in two ways. First, only the JusticeWeb print-out bears such a marking. Therefore, even if accurate, the September 23, 2015 print date does not reflect the print date of the appellate court decision. Second, Ms. Whittaker testified that the highlighted JusticeWeb print-out contained in Defense Exhibit 1 was part of the paperwork she received from the "screener," which paperwork she testified, as a matter of course, was provided to her prior to her conducting a first visit. However, both the first and second home visits occurred the week prior to September 23, 2015. (*Id*. at 44-45).

In short, either: (1) the 'printed on' date is inaccurate; or (2) the highlighted JusticeWeb print-out in Defense Exhibit 1 could not have been part of Ms. Whittaker's initial paperwork. Either way, the Court finds the print date an unreliable indicator of which documents Ms. Whittaker possessed during the home visits.

51-54).[4]  While Ms. Whittaker acknowledges Minor 2's statements, she denies having read anything to the minors.  (*Id*.)  Moreover, none of the details Minor 2 described regarding Defendant's criminal history were contained in the paperwork Ms. Whittaker testified having had with her during the first home visit.  (*Id*. at 86).  However, the appellate decision, which Ms. Whittaker obtained prior to the second home visit, <u>does</u> contain information similar to what Minor 2 described to Ms. Gevedon.  (*Id*.)

Following the forensic interviews, Ms. Whittaker stayed in contact with the minors' family and conducted several additional home visits.  (*Id*. at 54).  Ms. Whittaker also maintained contact with law enforcement regarding the case.  (*Id*. at 59-61).

In December 2015, the minors' mother called Ms. Whittaker to raise further concerns regarding her children.  (*Id*. at 61-62).  Based on those concerns, Ms. Whittaker

---

[4] *See* Recording of First Forensic Interview, Sept. 18, 2015, Def. Ex. 2 at:

**07:35** (CG: "And do you know anything about him [sexually abusing] anybody?"  M2: "Well, he- he did it to this 11-year-old boy…"  CG: "Okay, and how do you know that he was doing it to an 11-year-old boy?"  M2: "It's because her who was over there [Alina Whittaker] and this other girl had a paper and it said it.  It was highlighted.");

**16:25** (CG: "When [Alina] was talking to you guys about that Jory was a sex offender and had done something to an 11-year-old boy, did she say what he did to that boy?"  M2: "Mmhmm" CG: "What did she say?"  M2: "Well, well she read it and then I heard it."  CG: "Okay, and what was it that she read?"  M2: "It umm, it said umm Jor-Jory, umm, is a sexual offender.  He- he- it said he raped an 11 years old boy.  And he touched all his private parts and everything.  And he- and he said it- he proved it that he did, but he's not proving it to us that he did."  CG: "Okay, did it say where he and the 11-year-old boy were when he touched private parts?"  M2: "No." CG: "Okay, alright."  M2: "Well, it's because she only read the highlighted part."); and

**35:54** (CG: "And you said that Jory would say things like: 'No one's cuddling with me.  Who's going to cuddle with me?'"  M2: "Mmhmm, it's because on that paper that she brought, it said, it said Jor-Jory wants to cuddle with that 11-year-old boy, he likes to cuddle."  CG: "Okay, okay. Did you see anything else about what-- it was written down on that paper that Jory did with the 11-year-old boy besides cuddle?"  M2: "Uh, well, the thing that I said before, he- he touches privates and he admitted it and stuff.  He took a shower with him.").

arranged for a second forensic interview, which took place the last week of December 2015. (*Id*. at 62). Ms. Whittaker also contacted Detective Douglas Todd. (*Id*. at 68).

The second interview was conducted at Michael's House by a new interviewer, Amy Ferguson. (*Id*. at 64). Det. Todd was present. (*Id*. at 68). Prior to the interview, Det. Todd questioned Ms. Whittaker regarding whether she had shown the minors anything relating to Defendant's prior offense. (*Id*.) Ms. Whittaker told Det. Todd that she had shown only Defendant's Sex Offender registry to the parents, but nothing more. (*Id*. at 68-69). On cross-examination, however, she stated that she had shown the minors Defendant's picture from the Sex Offender registry print-out. (*Id*. at 72-73).

Ms. Whittaker left GCJFS at the end of December 2015. (*Id*. at 55). Prior to her departure, Ms. Whittaker had maintained all of the paperwork and handwritten notes she had amassed on the case since her first home visit. (*Id*.) However, Ms. Whittaker testified that on her last day of work, December 31, 2015, she removed from the case file and shredded all paperwork containing her handwritten notes. (*Id*. at 55-56). Neither Det. Todd nor any other member of law enforcement specifically instructed Ms. Whittaker regarding preserving or destroying any documents in the case file. (*Id*. at 69-70). Ms. Whittaker testified that she shredded the documents for confidentiality reasons and pursuant to policy. (*Id*. at 56). Specifically, Ms. Whittaker testified that although she had never seen a written policy regarding document retention or destruction, she was verbally instructed by her supervisor, Shelley Brecount, that it was GCJFS policy for caseworkers to shred all handwritten notes before either closing out a case or transferring a case to a co-worker. (*Id*. at 56-59). Ms. Whittaker clarified that she did not believe the

documents she shredded would have any significance to law enforcement and that she would have preserved the documents had she known otherwise. (*Id*. at 83).

Ms. Whittaker testified that she was contacted by Detective Donald Minnich, sometime around late-June 2016 regarding the documents that Ms. Whittaker had in her possession during the home visits.[5] (*Id*. at 66-67). Ms. Whittaker believes that she told Det. Minnich she had shredded all of her handwritten notes. (*Id*.) Ms. Whittaker also believes she told Det. Minnich that the notes were otherwise preserved in GCJFS's computer system. (*Id*. at 84).

### 2. *Testimony of Detective Douglas Todd*

Detective Douglas Todd is employed as a detective with the Hamilton County Sheriff's Office in the Criminal Investigation section. (Doc. 73 at 128). Det. Todd is also assigned to the juvenile missing persons squad, which investigates violent crimes against children. (*Id*. at 89-90).

In October 2015, Det. Todd became involved in the investigation of Defendant Jory Leedy. (*Id*. at 90). From the time he was first assigned to the case, until Defendant's arrest in April 2016, Det. Todd maintained a running investigation report to document significant aspects of the investigation. (*Id*. at 98-99, 118-19; Def. Ex. 6).[6]

Upon receiving the case, Det. Todd was also given the recordings of the minors' first forensic interviews, which had taken place at Michael's House on September 18,

---

[5] Ms. Whittaker could not recall the date Det. Minnich contacted her, but she testified that it was some time after she returned from maternity leave in mid-June 2016. (Doc. 73 at 66).

[6] Defendant's Exhibit 6 has also been filed under seal at Doc. 66.

2015.  (Doc. 73 at 90-92).  Because the forensic interviews were already complete, Det. Todd was able to obtain the minors' statements simply by reviewing the recorded interviews.  (*Id*. at 92).  Therefore, there was no need to re-interview the minors.  (*Id*. at 91-92, 97).

Det. Todd acknowledged that, during the first forensic interviews, one of the minors disclosed having been shown a document relating to Defendant, but he could not recall specifically what the minor alleged he was shown.  (*Id*. at 93).  He testified that, based on his recollection and understanding, he believed the minors were merely shown a photograph of Defendant.  (*Id*.)

On November 25, 2015, Det. Todd first spoke with GCJFS caseworker, Alina Whittaker.  (*Id*. at 96).  Det. Todd testified that the call was an introductory call in an effort to begin a general dialogue with Ms. Whittaker and also to learn the status of the GCJFS case and the status of the minors.  (*Id*.)

On December 10, 2015, Det. Todd spoke with Cynthia Gevedon, who had conducted the first forensic interview of the minors.  (*Id*. at 102; Doc. 66 – Def. Ex. 6 at 6).  During that conversation, Det. Todd and Ms. Gevedon discussed Minor 2's disclosure that Ms. Whittaker read, in his presence, highlighted portions of a document that described Defendant's prior offense.  (*Id*.)  Moreover, Ms. Gevedon told Det. Todd that she "wondered if [Minor 2] had been coached or coerced in any way."  (*Id*.)

Det. Todd testified that he had not understood Ms. Gevedon to be implying that Ms. Whittaker was responsible for coaching Minor 2.  (Doc. 73 at 126).  In other words, Det. Todd believed that Ms. Whittaker's possible disclosure of information to the minors

was an issue separate and apart from Ms. Gevedon's concern that someone (other than Ms. Whittaker) may have coached Minor 2.  (*Id*.)

Following his conversation with Ms. Gevedon, Det. Todd contacted Ms. Whittaker and asked her directly whether she had shown the minors anything regarding Defendant's 2002 criminal case.  (*Id*. at 105).  Ms. Whittaker stated that she had not.  (*Id*.) Regardless, Ms. Gevedon told Det. Todd that she believed Ms. Whittaker had in fact disclosed the details of Defendant's prior case to the minors' parents.  (*Id*. at 106; Def. Ex. 6 at 6).

Throughout his testimony, Det. Todd acknowledged repeatedly that he did not, at any point, ask Ms. Whittaker to preserve the documents in her file.  (*Id*. at 103, 108, 121, 135).  However, Det. Todd explained that his inaction was not an effort to withhold evidence.  (*Id*. at 135).  Rather, as an initial matter, he did not believe he had a duty to instruct Ms. Whittaker to preserve her own case file.  (*Id*. at 103, 125).  Indeed, in Det. Todd's experience, he had never had any trouble obtaining documents from a caseworker, nor was he aware of any GCJFS policy to destroy documents.  (*Id*. at 125).

Additionally, Det. Todd testified that while it caught his attention that Ms. Whittaker may have given the minors information regarding Defendant's prior case, he had not placed any significance in the physical document.  (*Id*. at 105-106, 133). Moreover, he had come to believe that the minors were merely shown a document containing Defendant's picture as opposed to any substantive information.  (*Id*. at 125).

Det. Todd testified that, in conducting an investigation, he makes it a point to seek the truth rather than prove guilt; and he further acknowledged that he had a duty to

preserve evidence. (*Id*. at 102-103, 122-123). However, in this investigation, he had not considered the document to be evidence. (*Id*. at 135).

On December 27, 2015, GCJFS informed Det. Todd that the minors had just recently disclosed additional information, including, *inter alia*, that Defendant had allegedly engaged in sexual intercourse with the minors. (Doc. 73 at 108; Def. Ex. 6 at 6). Based on the new allegations, GCJFS scheduled a second forensic interview of the minors. (*Id*.)

The second forensic interviews took place on December 29, 2015 at Michael's House.[7] (*Id*.; Doc. 73 at 109). Amy Ferguson, a trained forensic interviewer, conducted the interviews. (Def. Ex. 6 at 6). Det. Todd did not participate in the interviews but was present and able observe from a separate room. (Doc. 73 at 109).

Det. Todd testified that, prior to the second interviews, there were no allegations Defendant engaged in sexual misconduct with the minors outside the state of Ohio. (*Id*. at 97). Thus, Det. Todd had assumed the investigation was "all local." (*Id*. at 120).

---

[7] While Det. Todd's investigation report states that the second forensic interviews took place on December 28, 2015, various other documents list the date of the second forensic interviews as December 29, 2015. (Def. Ex. 6 at 6; Doc. 73 at 114). Det. Todd testified that it was possible he mistakenly wrote the wrong date in his report. (*Id*. at 108-109). Although the witnesses could not recall precisely which date the second forensic interviews took place, the absolute consensus is that the interviews took place either on December 28 or 29, 2015. (*Id*. at 62, 108-109, 114, 146).

Additionally, the Court notes that Det. Todd unequivocally testified that he contacted Det. Minnich minutes after leaving Michael's House, and Det. Minnich testified that Det. Todd contacted him on December 29, 2015. (*Id*. at 113, 160). Accordingly, the Court concludes that the second forensic interviews were held on December 29, 2015. However, even if the interviews had taken place on December 28, 2015, it would not change the Court's analysis or decision in this Order.

However, the minors' disclosures during the second interviews revealed offenses may have occurred outside of Ohio. (*Id*.) In light of the new disclosures, Det. Todd sought assistance of Detective Donald Minnich, a fellow Hamilton County Sheriff's detective whom Det. Todd knew to be a member of the FBI Task Force. (*Id*. at 120, 129).

Within minutes of leaving the second forensic interviews on December 29, 2015, Det. Todd called Det. Minnich to discuss the case. (*Id*. at 113). Det. Todd testified that this December 29, 2015 telephone call was the first time he sought federal assistance or involvement with the investigation. (*Id*. at 136).

The following day—December 30, 2015—Det. Todd met in person with Det. Minnich and Assistant United States Attorney Christy Muncy. (*Id*. at 114-15, 119). At that time, Det. Todd provided Det. Minnich with the case file, which included, *inter alia*, the recording of the first forensic interview and Det. Todd's investigation report (though not yet complete). (*Id*.) From that point forward, Det. Todd remained an active participant in the case, but was no longer involved in its "day-to-day operations." (*Id*. at 115).

### 3. Testimony of Donald Minnich

Detective Donald Minnich is employed as a detective with the Hamilton County Sheriff's Office and is also assigned to the FBI's Violent Crimes Against Children Task Force. (Doc. 73 at 142).

On December 29, 2015, Det. Minnich received a telephone call from Det. Todd regarding an investigation into Defendant's alleged misconduct with the minors. (*Id*.)

Prior to December 29, 2015, Det. Minnich had no involvement in the investigation, nor was he otherwise familiar with Defendant Jory Leedy. (*Id*. at 142, 162).

On December 30, 2015, Det. Minnich and AUSA Muncy met with Det. Todd to discuss the investigation. (*Id*. at 142-43). At that time, Det. Minnich received Det. Todd's running report, which detailed all events up to and including the second forensic interview. (*Id*. at 143-44).

The following day—December 31, 2015—Det. Minnich and Det. Todd went to the minors' home and informed the minors' mother that the FBI would be conducting the investigation going forward. (Def. Ex. 6 at 7).[8] The minors' mother also provided the detectives with various items of evidence, which evidence was collected and taken to the FBI. (*Id*.)

Det. Minnich testified that the process of first gathering and reviewing preliminary information about a case is necessary to ensure that an investigation is "legitimate" before he brings it to the FBI. (Doc. 73 at 162). Det. Minnich explained that, here, after having the opportunity to meet with Det. Todd and AUSA Muncy, review the case file, and briefly conduct his own preliminary work, he determined that the investigation warranted opening a case in the FBI's system. (*Id*.) Det. Minnich testified that he officially opened an FBI case on the investigation into Defendant Jory Leedy just after the first of the year (*i.e.*, a few days after meeting with Det. Todd). (*Id*.)

---

[8] The summary of the December 31, 2015 home visit is mislabeled as "January 31, 2015" in Det. Todd's report. (Def. Ex. 6 at 7). During the hearing, Det. Minnich confirmed that the home visit occurred on December 31, 2015, not January 31, 2015. (Doc. 73 at 144).

On January 12, 2016, Det. Minnich and Det. Todd interviewed the minors'
mother, possibly at Michael's House, in the presence of the family's social worker. (*Id*.
at 145). During the interview, Det. Minnich spoke with the mother regarding the minors'
December 2015 disclosures, which disclosures had prompted the second forensic
interviews. (*Id*. at 146-47). Det. Minnich learned that the minors' family had recorded
the disclosures and the minors' mother turned over those video recordings to Detective
Petit at the Fairborn Police Department. (*Id*. at 147). Det. Minnich received the
recordings from Det. Petit a few weeks later (*i.e.*, in January or February 2016). (*Id*.)

During the hearing, Det. Minnich acknowledged that the manner in which the
family questioned the minors during their disclosures was not "typical" and "wasn't
properly done by a forensic interviewer." (*Id*. at 149). Indeed, Det. Minnich testified
that, due to his concern over the possibility that the minors' disclosures had been
coached, he reached out to Amy Ferguson at Michael's House to inquire whether she
shared in his concerns. (*Id*.) Ms. Ferguson indicated to him only that "she firmly
believed that … something had occurred with the children and that they were abused."
(*Id*. at 148).

Det. Minnich further testified that his first opportunities to review the recordings
of the minors' first and second forensic interviews were on January 12, 2016 and January
17, 2016, respectively. (*Id*. at 144-45, 149). Det. Minnich stated that the forensic
interviews did not cause him concern regarding the minors having been coached because,
to his recollection, the minors had only indicated being shown a photograph of Defendant
and had possibly learned some additional information regarding Defendant's prior

criminal conduct. (*Id*. at 150). Det. Minnich recalled that Minor 1 and Minor 2, respectively, stated they were told Defendant previously murdered a child and that he raped a child, but Det. Minnich found no particular significance in those statements. (*Id*. at 175). However, Det. Minnich did not recall the minors indicating that anyone had read to them from a highlighted document. (*Id*. at 150).

Det. Minnich testified that in May 2016, AUSA Muncy contacted him and asked that he obtain any documents or information shown to the minors before their forensic interviews. (*Id*.) At the time, Det. Minnich was on vacation, but he reached out to Det. Todd upon his return in June 2016, and he subsequently contacted Det. Petit as well. (*Id*. at 151, 167). Det. Minnich testified that he asked both detectives whether their files contained any documents bearing Defendant's picture and which may have been shown to the minors. (*Id*. at 151). Neither detective found any such documents. (*Id*. at 151-52).

Det. Minnich then reached out to Amy Ferguson, who referred him to Cynthia Gevedon, who in turn referred him to Alina Whittaker. (*Id*. at 152). The process of identifying each individual, obtaining their contact information, and securing a call back, proved to be a lengthy endeavor. (*Id*. at 167, 171). Det. Minnich testified that, during this time, he continued to diligently work to fulfill AUSA Muncy's request and to do so in a timely fashion. (*Id*.) Moreover, AUSA Muncy called Det. Minnich every few days to inquire as to the status of the search for the documents. (*Id*. at 167).

Det. Minnich testified that he finally heard back from Ms. Whittaker in September 2016. (*Id*. at 153). Det. Minnich asked Ms. Whittaker if she had shown a picture of Defendant to the minors. (*Id*.) Ms. Whittaker indicated that, contrary to her request, the

minors had been present when she interviewed their parents and, at that time, the minors may have seen a document with Defendant's picture.  (*Id*.)  Ms. Whittaker did not say anything about the existence of handwritten notes.  (*Id*. at 168).  Det. Minnich then asked Ms. Whittaker about the origin and whereabout of the document in question.  (*Id*. at 153-154).  Ms. Whittaker told him that the document related to Defendant's sex offender registration, that she had obtained the document online, and that, if the document still existed, it would be in the GCJFS case file.  (*Id*. at 153-54, 168).  Det. Minnich then advised AUSA Muncy that the document was possibly still at GCJFS.  (*Id*. at 154).

On November 29, 2016, Det. Minnich met with the prosecutors and defense counsel at the U.S. Attorney's Office in Cincinnati, Ohio.  (*Id*. at 172; *see* Doc. 48 at 4).  The meeting was held in an effort identify and locate the document at issue.  (Doc. 73 at 172).  Ultimately, it was determined that Det. Minnich, the prosecutors, and defense counsel would benefit most from an opportunity to meet with Ms. Whittaker in person.  (*Id*.)  Det. Minnich, with the help of AUSA Muncy, arranged for the meeting with Ms. Whittaker to occur on December 9, 2016, at the U.S. Attorney's Office in Dayton, Ohio.  (*Id*. at 172-73).

Det. Minnich testified he did not learn *definitively* that the documents at issue had been destroyed until the December 9, 2016 meeting with Ms. Whittaker in Dayton.  (*Id*. at 160-61).[9]  Further, prior to the December 9, 2016 meeting, Det. Minnich had no

---

[9] Based on his testimony, it appears that, either at or around the time of November 29, 2016 meeting, Det. Minnich first learned that the document at issue was not in the GCJFS case file, and thus he began to suspect that the document had been destroyed.  (Doc. 73 at 157-58, 160, 161, 176, 177).

knowledge of any GCJFS policy that called for caseworkers to destroy handwritten case notes before transferring a file to another caseworker. (*Id*. at 160). Det. Minnich stated that, from the date he first became involved in the investigation (December 29, 2015), through the date that, unbeknownst to him, Ms. Whittaker destroyed the documents in question (December 31, 2015), he did not take any active steps to ensure the preservation of documents in the case file. (*Id*. at 160-61). Det. Minnich also clarified that GCJFS was not part of the law enforcement, investigative, or prosecution team. (*Id*. at 170).

## II.  STANDARD OF REVIEW

"As a general principle, motions for reconsideration are looked upon with disfavor unless the moving party demonstrates: (1) a manifest error of law; (2) newly discovered evidence which was not available previously to the parties; or (3) intervening authority." *Blankenburg v. Miller*, No. 1:16-CV-505, 2017 WL 3730610, at *1 (S.D. Ohio Aug. 30, 2017) (citations omitted).

## III.  ANALYSIS

In light of the newly discovered truth as to the destruction of the document at issue, Defendant moves for reconsideration of the Court's prior Order (Doc. 46) denying dismissal. (Doc. 48). Specifically, Defendant asserts that "a critical document that would have served as a key component of [his] defense has been destroyed because the government and its agents failed to take adequate steps to preserve [it]." (Doc. 74 at 1). Defendant argues that failure to preserve the document "violates [his] rights under the Due Process Clause and constitutes prosecutorial misconduct, [and thus] dismissal of all charges with prejudice is warranted…." (Doc. 48 at 1).

As a preliminary matter, the Court believes that discovery of the document's destruction constitutes "newly discovered evidence which was not available previously to the parties," and, therefore, reconsideration is warranted. *See Miller*, 2017 WL 3730610, at *1. In the context of this newly discovered information, the Court will reconsider Defendant's arguments as to: (A) the failure to preserve evidence; and (B) prosecutorial misconduct.

## A. Failure to Preserve Evidence

Defendant argues primarily that destruction of the document shown to the minors prior to the first forensic interviews amounts to a due process violation, irreparably prejudices the defense, and accordingly warrants dismissal of all charges. (Doc. 48, 65, 74). Defendant asserts that the document was a critical tool for impeachment and that the document's existence was known and its value was apparent to the investigating law enforcement officers. (Doc. 74 at 4-8). Thus, Defendant argues that the failure of the Government and its agents "to preserve or even *attempt* to preserve the document [shown or read to the minors prior to the first forensic interview] amounts to a Due Process violation that has impaired the fundamental fairness of these proceedings and has destroyed the opportunity for a truly fair trial in this matter." (Doc. 65 at 1).

Due process and the interests of fundamental fairness "require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). To safeguard this right, the Supreme Court has established "what might loosely be called the area of constitutionally guaranteed access to evidence," which area encompasses the Government's obligations

relating to disclosure and production of certain evidence. *Id*. (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867 (1982)).

The Supreme Court has established two separate tests for determining whether the Government's failure to preserve evidence amounts to a due process violation. *United States v. Collins*, 799 F.3d 554, 569 (6th Cir. 2015). "The **first** test, established in [*California v. Trombetta*, 467 U.S. 479 (1984)], applies in cases where the government fails to preserve material exculpatory evidence, while the **second** test, established in *Arizona v. Youngblood*, 488 U.S. 51 (1988), applies in cases where the government fails to preserve 'potentially useful' evidence." *Id*. (emphasis added) (quoting *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001)).

Under *Trombetta*, "[t]o meet th[e] standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489 (citation omitted). "[W]hen the [Government] suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld." *Illinois v. Fisher*, 540 U.S. 544, 547 (2004).

However, "the Due Process Clause requires a different result when we deal with the failure of the [Government] to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57. "[U]nless a criminal defendant

can show bad faith on the part of the police, failure to preserve potentially useful evidence [(as opposed to material exculpatory evidence)] does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58; *Fisher*, 540 U.S. at 547–48.[10]

---

[10] This Court recognizes that the Sixth Circuit has established a three-factor test synthesizing the *Youngblood* standard. *See Collins*, 799 F.3d at 569; *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996). Specifically, the Sixth Circuit holds that:

> [U]nder the *Youngblood* standard, in cases "where the government fails to preserve evidence whose exculpatory value is indeterminate and only potentially useful," the defendant must demonstrate: "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means."

*Collins*, 799 F.3d at 569 (quoting *Jobson,* 102 F.3d at 218).

Respectfully, however, this Court agrees with Sixth Circuit Court of Appeals Judge Ronald L. Gilman's separate concurrence in *United States v. Wright*, which sets forth a thorough analysis and visual chart explaining why the Sixth Circuit's *Jobson* test misapplies the standards of *Trombetta* and *Youngblood*. *Wright*, 260 F.3d at 573 (Gilman, J., concurring in judgment) ("The problem with *Jobson* is that it conflates the differing tests of *Trombetta* and *Youngblood* such that there is no longer any distinction between materially exculpatory and potentially exculpatory evidence").

In short, it is inconsistent with the Supreme Court's holding under *Youngblood* for the Court to require a defendant who has already shown the Government's bad faith in destroying evidence to further demonstrate that the exculpatory value of the evidence was apparent and that there is no comparable evidence available. As the *Youngblood* court recognized, a definitive showing of bad faith, in and of itself, necessarily implies that the evidence must have held some value. 488 U.S. at 58. Indeed, why else would its destruction be in bad faith? Thus, distinct from *Trombetta*, the *Youngblood* standard provides that the act of destroying evidence in bad faith is sufficient to implicate a potential due process violation, even where the defendant can only show the evidence was potentially useful versus materially and apparently exculpatory.

The Supreme Court re-emphasized this point in *Illinois v. Fisher*, stating that "the applicability of the bad-faith requirement in *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence." 540 U.S. at 549 (quoting *Youngblood*, 488 U.S. at 57–58). Where "the substance [or item] destroyed … was, at best, 'potentially useful' evidence … *Youngblood*'s bad-faith requirement applies." *Id.*

Here, the Court cannot conclude that the document constitutes "material exculpatory evidence," such that the *Trombetta* analysis should apply. Indeed, as Defendant acknowledges, the document's value would have been in undermining the credibility of the Government's potential witnesses—whether the minors, the parents, or Ms. Whittaker—and potentially casting doubt on the reliability of the investigation. However, even if the document somehow definitively established that the minors were fed information regarding Defendant's prior criminal conduct, that would not prove that the minors' disclosures regarding their own alleged abuses were false. Moreover, one of the minors in this case stated, in his recorded forensic interview, that a document existed, that it contained information regarding Defendant's criminal history, and that highlighted sections of the document were read to them. In light of the recorded acknowledgments of the minor, it seems the actual document would be redundant, at best. Frankly, the Court can think of no better means of impeachment than the minor's own statement referencing the document. Thus, at best, the document may be "potentially useful," and therefore the *Youngblood* standard applies.

Under *Youngblood*, the destruction of "potentially useful" evidence does not constitute a due process violation unless the evidence was destroyed in bad faith. 488 U.S. at 58. Here, there is no evidence of bad faith.

As an initial matter, the Court finds that federal involvement in the investigation did not commence until December 29, 2015, and thus the Government cannot be held responsible for the conduct occurring prior to that date. Moreover, the Court cannot conclude that GCJFS was part of the investigative or prosecution team, such that the

Government should be held to answer for its conduct. Not every source of information utilized by law enforcement or the Government naturally become part of the team. GCJFS is a county department offering benefits and public assistance to the local community. (Doc. 61 at 2 n.1) ("Greene County JFS is state agency which provides services to families, such as family assessments, well-being checks, and support for temporary and permanent child placement") (citing Greene County, Ohio, www.co.greene.oh.us). It does not function at the behest or direction of the federal prosecutors or law enforcement. (Doc. 73 at 170).

Thus, the question before the Court is whether the Government, likely through Det. Minnich, acted in bad faith by failing to request the preservation of the case file from GCJFS during the roughly two days that elapsed between Det. Minnich receiving the call from Det. Todd (December 29, 2015) and Ms. Whittaker destroying the documents before leaving her position at GCJFS (December 31, 2015). The Court finds no evidence of bad faith.

Indeed, while the Court equates federal involvement with Det. Minnich's mere awareness of the case, Det. Minnich testified that he spent the first few days determining whether the case warranted FBI involvement, and that the federal case was not opened in the FBI system until after the new year (*i.e.*, January 2016). Thus, it would have been premature to serve preservation letters during the time period from December 29-31, 2015. Moreover, it would have been unreasonable to expect that preservation letters could have been prepared, served, received, reviewed, and complied with, given the short duration of time that passed (*i.e.*, in effect, two days, one of which was New Year's Eve).

Also, there is no evidence that anyone working on the case—including, *inter alia*, Det. Minnich, Det. Todd, or AUSA Muncy—had any knowledge that Ms. Whittaker was leaving her job or that she would destroy documents in the file of an active GCJFS case. Frankly, it defies logic to assume that a caseworker would destroy documents contained in the file of active case, under any set of circumstances. Thus, it is unreasonable to fault the Government or law enforcement for not immediately demanding that GCJFS preserve the file.

Even assuming *arguendo* that the Government should be held accountable for the conduct of GCJFS or local law enforcement (*i.e.*, before federal involvement began on December 29, 2015), the Court still finds that there is no evidence of bad faith. Specifically, Ms. Whittaker testified that she destroyed the documents based on her belief that it was GCJFS policy for caseworkers to input the information from handwritten notes into the computer and then destroy the notes before a caseworker closes or transfers the case. Even if her belief as to the policy were wholly erroneous, that error does not rise to the level of bad faith.

Moreover, there is no evidence whatsoever that Det. Todd acted in bad faith by failing to request preservation of the case file. The Court acknowledges Defendant's point that Det. Todd sent preservation letters to AT&T and Verizon in November 2015, thereby demonstrating his knowledge of the procedure. (Doc. 65 at 6). However, as the Court previously noted, the notion that GCJFS would need to be told to preserve their own active case file simply defies logic. Indeed, Det. Todd testified that he did not believe he had a duty to instruct Ms. Whittaker to preserve her own case file, and that he

never experienced any trouble obtaining documents from a caseworker in the past, nor was he aware of any GCJFS policy to destroy documents. (*Id*. at 103, 125). Thus, even if, in hindsight, sending such a preservation letter may have been a sound approach, there is certainly no evidence that Det. Todd acted in bad faith by not doing so.

Finally, the Court notes that the destruction of the evidence here would not rise to the level of a due process violation, even under the *Trombetta* standard. To prevail under *Trombetta*, the evidence must: (1) possess an exculpatory value that was apparent before the evidence was destroyed; and (2) be of such a nature that the defendant would be unable to obtain <u>comparable</u> evidence by other reasonably available means. 467 U.S. at 489.

Notably, the *Trombetta* standard does not require an exact duplicate of the evidence to be available to Defendant, but rather requires only "comparable evidence." *Id*. Here, as this Court previously noted, the destruction of the document has not left Defendant entirely without a means of cross-examination. Indeed, the recorded statements of the minors and the reality of the destruction of the document (which evidence this Court would likely admit at trial) serve as equally powerful tools, if not more so, for purposes of cross-examination and impeachment.

Accordingly, the Court finds no due process violation arising from the document's destruction, and dismissal of the charges is therefore not warranted.

### B. Prosecutorial Misconduct

Defendant's motion for reconsideration initially renewed his argument as to prosecutorial misconduct. (Doc. 48). The Court notes, however, that Defendant's

argument was, to some extent, based upon an act of alleged misconduct, which act defense counsel improperly attributed to AUSA Muncy. (*Id*. at 7-8). Defense counsel subsequently acknowledged and apologized for his error in that regard, and Defendant's reply (Doc. 65) and post-hearing brief (Doc. 74) appear to refocus the argument toward the failure to preserve evidence. Nevertheless, the Court believes some consideration of the initial argument is appropriate.

The Court may dismiss an indictment where "outrageous government conduct" results in a violation of a defendant's right to due process. *United States v. Napier*, 787 F.3d 333, 341 (6th Cir. 2015). "[O]utrageous government conduct outside the grand jury process can result in dismissal on due process grounds if such conduct is so outrageous that it violates 'fundamental fairness' or is 'shocking to the universal sense of justice.'" *Id.* (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)). However, in light of "the strong public interest in prosecuting serious crimes, prejudice to the defendant must be shown before dismissal of an indictment would be warranted…." *United States v. Adamo*, 742 F.2d 927, 941 (6th Cir. 1984) (quoting *United States v. Nembhard*, 676 F.2d 193, 200 (6th Cir.1982)).

Additionally, even if the Government's conduct were to fall short of a due process violation, the Court may nonetheless choose to exercise its supervisory power to dismiss the indictment. *Adamo*, 742 F.2d at 941. For the Court to dismiss the indictment under its supervisory power, the defendant must show: (1) "demonstrated and longstanding prosecutorial misconduct"; and (2) prejudice to the defense. *United States v. Smith*, 687 F.2d 147, 152–53 (6th Cir. 1982). Particularly where dismissal is based upon the Court's

supervisory power rather than upon a constitutional basis, the defendant must demonstrate that the resulting prejudice has or will actually undermine a fair trial. *Adamo*, 742 F.2d at 941.

Dismissal is generally a disfavored remedy. *United States v. Rozin*, 552 F.Supp.2d 693, 699 (S.D. Ohio 2008). Thus, dismissal is not appropriate where an alternative remedy would eliminate prejudice to the defense and assure Defendant's right to a fair trial. *See Adamo*, 742 F.2d at 941-42.

In his motion for reconsideration, Defendant initially raised two arguments in support of dismissal due to prosecutorial misconduct. (Doc. 48). First, Defendant focuses on alleged misconduct occurring later in the instant case, which argument is premised largely on the assumption that *the prosecutor* misled the Court into believing the Government had complied with the November 2016 Discovery Order. (*Id*. at 2-6).[11] Second, Defendant argues that, "[e]ven if the Court were to find that the Government's conduct falls short of a due process violation, the Court may choose to exercise its supervisory power and dismiss the [charges]," based upon allegations of the prosecutor's historic misconduct. (*Id*. at 7-8). The Court finds no merit in either argument.

---

[11] The Court's prior Order (Doc. 46) addressed Defendant's prosecutorial misconduct arguments relating to alleged delay and gamesmanship during the early stages of the instant case; and Defendant's motion for reconsideration (Doc. 48) does not make a significant point of re-raising the issue. Moreover, having heard the evidence adduced during the evidentiary hearing, the Court concludes that the Government—specifically, AUSA Muncy—did in fact take appropriate steps to comply with Defendant's requests and the Court's orders. Thus, further consideration of this point is unwarranted.

First, Defendant argues that the Government's representations in its November 22, 2016 email misled the Court into believing the Government complied with the Discovery Order. (*Id*. at 2-3, 6, 8). Moreover, Defendant argues that "the Government has left the Court with th[is] wrong impression," and "has not returned to the Court to inform the Court [of the error]." (*Id*. at 6, 8). In short, Defendant assumes that *the Government's* representations misled the Court and that it was therefore *the Government's* responsibility to rectify the situation. However, this assumption is incorrect.

Rather, at the time of the email exchange, the Court saw that AUSA Muncy concluded her November 22, 2016 email <u>to defense counsel</u> by stating, "**<u>I believe</u>** this completes the defense's request related to this issue and fully complies with the Court's order. **<u>Please confirm</u>** whether you agree." (Doc. 48, Ex. 2) (emphasis added). Accordingly, the Court waited for defense counsel to respond.

By the following afternoon, having received no response from defense counsel raising an objection, the Court issued a Notation Order stating: "As the Government recently obtained and provided Defendant with a copy of the outstanding item of additional discovery, the need for further briefing on Defendant's motion to dismiss is MOOT. The Court will issue a written decision by separate entry." (Notation Order, Nov. 23, 2016). Notably, at the time the Court issued this Notation Order, defense counsel had already reviewed the Government's email, concluded that the documents were not those sought by the defense, and had emailed an objection <u>to the Government only</u>. Thus, the Court's belief regarding the Government's compliance was not premised upon the Government's representations, but rather *Defendant's* failure to keep the Court

apprised of his objection. Moreover, upon seeing the Court's notation order, the defense was undoubtedly aware that its decision to remove the Court from the email chain had caused a rift in communication. Regardless, five days passed before the Court issued its written Order denying Defendant's motion to dismiss, and at no point during this time period did the defense bring this to the Court's attention.

Accordingly, the Court finds the Government made no misrepresentations to the Court, nor did it have an obligation to rectify the defense's error.[12]

Second, the Court believes it should be noted, for the record, that Defendant's allegation as to AUSA Muncy's conduct in a prior case was made entirely in error, as defense counsel acknowledged. Indeed, Defendant misidentified AUSA Muncy as the prosecutor involved in the prior case and thus the argument is not only meritless, but is entirely inaccurate and shall be deemed STRICKEN from the record.

## IV. CONCLUSION

Based upon the foregoing, Defendant's motion for reconsideration of dismissal (Doc. 48) is **DENIED**.

**IT IS SO ORDERED.**

Date: December 17, 2018                                    *s/ Timothy S. Black*
                                                          Timothy S. Black
                                                          United States District Judge

---

[12] Given that the Court's notation order stated its intent to issue a written decision, it would have been courteous, at the very least, for either party to reach out and ask the Court to stay its decision pending the receipt of further relevant information, if for no other reason than to spare the Court expending needless time and effort. However, the issue is not one of mere *courtesy*, but rather whether the Government had a *duty* to reach out to the Court, such that failure to do so constitutes misconduct. The Court finds the Government had no such duty.