**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,      :      Case No. 1:16-cr-036
                                              :
vs.                                           :      Judge Timothy S. Black
                                              :
JORY LEEDY,                          :
                                              :
          Defendant.                    :

**ORDER DENYING**
**DEFENDANT'S MOTION TO WITHDRAW**
**HIS GUILTY PLEA**

This criminal case is before the Court on Defendant Jory Leedy's motion to

withdraw his guilty plea (Doc. 111) and the parties' responsive memoranda (Docs. 113,

114).

**I.  BACKGROUND**

**A. Pretrial Proceedings**

On April 20, 2016, Defendant Jory Leedy was charged by way of indictment with

two counts of aggravated sexual abuse of a child under the age of twelve, in violation of

18 U.S.C. § 2241(c) (Counts 1 and 2).  (Doc. 11).

A superseding indictment, filed on December 21, 2016, added one additional

count of the same offense.  (Doc. 51).  The new charge became Count 1 of the

Superseding Indictment, and the two counts charged in the original indictment became

Counts 2 and 3 of the Superseding Indictment.  (*Id.*).

As charged in the Superseding Indictment, Defendant faced a statutory maximum term of life imprisonment as to Count 1. (*Id.* at 1).[1] As to Counts 2 and 3, the statutory penalties call for a mandatory minimum term of 30 years imprisonment up to life, unless the Court determines that Defendant's prior conviction constituted a predicate offense for purposes of the statutory sentencing enhancement, which enhancement would require the Court to impose a mandatory life sentence.[2] (*Id.*)

Prior to trial, the Court resolved a number of pretrial motions. Relevant to this Order, however, was the Court's May 24, 2019 oral ruling granting the Government's motion to exclude the testimony of Defendant's proposed expert witness, David Lowenstein, Ph.D. (Doc. 116). Specifically, Defendant's first attorney, Richard Monahan, Esq., initially contacted Dr. Lowenstein in 2016. On July 18, 2016, Dr. Lowenstein prepared a report after reviewing recorded forensic interviews of the minors

---

[1] The conduct charged in Count 1 of the Superseding Indictment was alleged to have occurred between January 1, 1999 and June 1, 2001. (Doc. 51 at 1). At the time of the alleged conduct, the statutory penalty for the offense was "any term of years or life." 18 U.S.C. § 2241(c) (eff. Oct. 30, 1998 to Jan. 4, 2006). The statute was subsequently amended, increasing the penalty to a mandatory minimum of 30 years imprisonment up to life. 18 U.S.C. § 2241(c) (amended Jul. 27, 2006).

[2] In or around 2002, Defendant was convicted in an unrelated case of two counts of gross sexual imposition involving a child under the age of 13 (specifically, an 11-year-old). *See State of Ohio v. Jory Leedy*, Montgomery Co. C.P. No. 2002 CR 2271 (filed Jun. 28, 2002). Because the conduct charged in Counts 2 and 3 were alleged to have occurred between March 1, 2014 and September 1, 2015—*i.e.*, after Defendant's 2002 convictions—Counts 2 and 3 were subject to the enhanced penalty of a mandatory life sentence. (Doc. 51 at 1-2); 18 U.S.C. § 2241(c). In a pretrial motion, Defendant argued that his prior convictions did not qualify as Section 2241(c) predicate offenses. (Doc. 41). However, the Court found that "the applicability of the recidivist enhancement … [was] not yet ripe for decision, as adjudication of the matter [wa]s contingent upon a future event, *i.e.*, conviction, which may not occur." (Doc. 87 at 5). Accordingly, the Court deferred the decision until such time, if ever, that the matter became ripe for decision. (*Id.*)

(as identified in Counts 2 and 3 of the Superseding Indictment) and their parents.[3]  Dr. Lowenstein opines in his report that: the minors were "clearly coached" about many of the events they recount during the interviews, as evidenced by their inability to define certain phrases or elaborate on particular allegations; the minors' stories lack credibility due to inconsistencies and their difficulty in recounting events over the span of two interviews; the minors' parents were negligent; and that the interview of the parents was "more of an interrogation," although Dr. Lowenstein conceded that the minors' interviews were "much more adequate."  In short, Dr. Lowenstein's opinions are based on nothing more than his <u>plain observations</u> and *personal* judgment.

On May 20, 2019, Mr. Tierney provided the Government with notice of intent to call Dr. Lowenstein as an expert witness.  (Doc. 101-3; Doc. 116 at 3).  In his letter to the Government, Mr. Tierney states, in relevant part, that:

> Dr. Lowenstein is expected to testify at trial based, in part, on his knowledge, skill, experience, training and education as to his specialized knowledge involving forensic interviewing of children in cases involving sexual abuse and the suggestibility of child witnesses.
>
> …
>
> [Having reviewed the forensic interviews,] Dr. Lowenstein is expected to testify that there is evidence that the boys were coached about what to say regarding the alleged abuse.  Dr. Lowenstein is expected to testify that the stories the minors told changed significantly between the first forensic interview and the second forensic interview.  The video recording made

---

[3] The Court's Order Denying Defendant's Motion for Reconsideration provides a thorough recitation of the forensic interviews conducted by Greene County Department of Job and Family Services.  (Doc. 81).

> by the family indicates that the boys were clearly coached about many of the alleged events.
>
> Dr. Lowenstein is expected to testify that the forensic interviews improperly influenced the minors' stories about the alleged abuse. Further, the family of the minors improperly influenced the minors.

(Doc. 101-3).

On May 24, 2019, the Government filed a motion seeking to exclude Dr. Lowenstein's testimony, arguing that the disclosure of Defendant's purported expert was untimely and inadequate under Fed. R. Crim. P. 16. (Doc. 101 at 1-7). Additionally, the Government challenged the admissibility of Dr. Lowenstein's testimony under Fed. R. Evid. 702. (*Id*. at 7-9). The Court held a hearing on the Government's motion that same day and heard arguments from the defense. (Doc. 116). Specifically, defense counsel explained the reason for the delay in disclosing Dr. Lowenstein as an expert, including, *inter alia*, Dr. Lowenstein's initial refusal to accept the CJA's reduced fee, the time needed to complete the case budgeting process, the time it took Dr. Lowenstein to receive and review the additional recordings, the nearly three-weeks it took Dr. Lowenstein to report his technical difficulties to Mr. Tierney (which Mr. Tierney rectified in a single day), and counsel's own understandably impacted calendar. (*Id*. at 8-11, 24). At the hearing, the Court specifically recognized that Mr. Tierney had not acted in bad faith with regard to the disclosure and, indeed, noted that Mr. Tierney is a highly competent lawyer. (*Id*. at 24, 29). Regardless, the Court granted the Government's motion, finding not only that the timing of the disclosure would prejudice the Government, but also repeatedly

noting that <u>Dr. Lowenstein's testimony would not serve to assist the jury and that its exclusion would not prejudice the defense</u>. (*Id*. at 30).

After resolving pretrial motions, the Court held the Final Pretrial Conference on Wednesday, May 29, 2019, with jury trial scheduled to commence on Monday, June 3, 2019. (Doc. 88; Min. Entry, May 29, 2019).

However, on Friday, May 31, 2019, the Court received notice that Defendant had entered into a plea agreement, and the executed agreement was filed on the docket later that afternoon. (Doc. 105). Given the late hour of the filing, the Court advised the parties that it would address the plea agreement on the morning of June 3, 2019, and would proceed with a change of plea hearing at that time, if and as appropriate. Nevertheless, in an abundance of caution, the Court neither vacated the trial date, nor did it recall the summons to prospective jurors. In other words, the Court was ready and willing to proceed to trial as scheduled, in the event that Defendant ultimately elected not enter a guilty plea.

On the morning of June 3, 2019, outside the presence of any prospective jurors, the Court conferred with the parties on the record, in open court, to inquire as to how the defense intended to proceed. (Doc. 110 at 2-3). At that time, Defendant confirmed his intent to plead guilty to Count 2 of the Superseding Indictment, pursuant to the Rule 11(c)(1)(C) plea agreement, which agreement included a proposed binding sentence of 30 years imprisonment and at least five years of supervised release (*Id*. at 2-6; Doc. 105 at ¶ 7). Upon Defendant's oral motion to enter a guilty plea, the Court proceeded with a change of plea colloquy. (Doc. 110 at 3-4).

### A. Change of Plea Colloquy

For purposes of the plea colloquy, Defendant was first placed under oath. (Doc. 110 at 4). In response to the Court's inquiries, Defendant confirmed that he was literate, sober, and not suffering from any mental illness. (*Id*. at 4-6). Defendant also confirmed that he was aware of the nature of the charges against him and the applicable penalties, that he had fully discussed the charges and any possible defenses with his attorney, and that he was prepared to proceed with his guilty plea, pursuant to the plea agreement. (*Id*. at 5-6). Defendant further confirmed that he was aware of the Government's burden at trial, and that he was aware of and agreed to waive his constitutional right to proceed to trial and to present a defense, if and as he chose. (*Id*. at 7-8). Defendant also confirmed that he was prepared to truthfully answer the Court's questions about the accuracy of the Statement of Facts. (*Id*. at 9). Additionally, Defendant confirmed that he understood the terms of the Rule 11(c)(1)(C) agreement and the proposed binding sentence, and that he understood the Court's responsibility at sentencing with regard to the U.S. Sentencing Guidelines and the factors set forth under 18 U.S.C. § 3553(a). (*Id*. at 9-11).

The Court then asked the Government to summarize the terms of the plea agreement, paragraph by paragraph, as Defendant followed along with his own written copy. (*Id*. at 11). In summarizing the plea agreement, the Government read the elements of the offense charged in Count 2, and Defendant specifically admitted that his conduct met those elements. (*Id*. at 12). The Government further summarized and/or read in full the remaining paragraphs of the plea agreement, including, *inter alia*: Defendant's agreement to enter a plea of guilty to Count 2 of the Superseding Indictment and to not

withdraw the plea; Defendant's agreement to waive the protections otherwise afforded to him under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410; the parties' proposed binding sentence; Defendant's appellate and collateral attack waiver; Defendant's obligations under the Sex Offender Registration and Notification Act; the consequences should Defendant violate the plea agreement; and Defendant's acknowledgment and acceptance of the plea agreement.  (Doc. 105 at ¶¶ 1, 5, 7, 10, 12, 14, 15; Doc. 110 at 11-17).

Specifically, Defendant's acknowledgment in paragraph 15 of the plea agreement states as follows:

> The Defendant acknowledges that he has read and understands this plea agreement; that **he accepts this plea agreement knowingly and voluntarily and not as a result of any force, threats, or promises, other than the promises in this plea agreement**; that he has conferred with his attorney regarding this plea agreement and the facts and circumstances of his case, including the applicable law and potential defenses, and that **he is fully satisfied with the representation, advice, and other assistance of his attorney in this case**.

(Doc. 105 at ¶ 15) (emphasis added).

After the Government completed its paragraph-by-paragraph summary of the plea agreement, the Court held a colloquy with Defendant, to ensure that, among other things, his decision to plead of guilty was a knowing and voluntary decision, and not the result of any force, threats, or coercion:

> **THE COURT: You read this Plea Agreement carefully, Mr. Leedy, and discussed it fully with your lawyer before you signed it; is that right?**
>
> **DEFENDANT: Yes**.

THE COURT: Has anybody made you any promise that's not written down on these four pages?

DEFENDANT: No.

THE COURT: There are no side agreements; correct?

DEFENDANT: Correct.

THE COURT: Is that right, Mr. Tierney? This four-page document reflects the entire agreement between the parties; is that right?

MR. TIERNEY: Yes, Your Honor.

THE COURT: Very well. Has anybody made you any other or different promise or assurance of any kind that is making you plead guilty or inducing you to plead guilty, Mr. Leedy?

DEFENDANT: No, Your Honor.

THE COURT: And you've discussed all of this fully with your lawyer, Mr. Tierney; is that right?

DEFENDANT: Yes, Your Honor.

**THE COURT: Do you believe your lawyer is fully informed about the facts and circumstances on which the charge is based?**

**DEFENDANT: Yes, Your Honor.**

**THE COURT: And are you fully satisfied with your lawyer's advice and representation?**

**DEFENDANT: Regarding this agreement, yes, Your Honor.**

**THE COURT: Very well. Has anybody threatened you or imposed force of any kind which is making you plead guilty?**

**DEFENDANT: No, Your Honor.**

**THE COURT: Is there anything I've done or said that's making you plead guilty?**

8

> **DEFENDANT: No, Your Honor.**
>
> **THE COURT: So is your decision to plead guilty your own free and voluntary act?**
>
> **DEFENDANT: Yes, Your Honor.**

(Doc. 110 at 17-19) (emphasis added).

The Court also revisited certain paragraphs in the plea agreement, including, *inter alia*, confirming Defendant is aware of the applicable statutory penalties for the offenses charged, that he admits his guilt to the elements of Count 2, that he understands the Rule 11(c)(1)(C) agreement and proposed binding sentence, and that he understands his appellate and collateral attack waiver. (*Id*. at 19-21). The Court then asked Defendant:

> THE COURT: Very well.  You signed this on May 31st; correct?
>
> DEFENDANT: Correct, Your Honor.
>
> **THE COURT: So you've had a couple of days to think about it; right?**
>
> **DEFENDANT: Yes, Your Honor.**
>
> **THE COURT: And you're prepared to take responsibility by pleading guilty; correct?**
>
> **DEFENDANT: Correct, Your Honor.**

(*Id*. at 21) (emphasis added).

At the Court's request, the Statement of Facts was then read aloud, verbatim, by Task Force Officer Donald Minnich on behalf of the Government. (*Id*. at 21-26). After the Statement of Facts was read aloud, in full, the Court asked Defendant a series of questions in order to confirm whether the entirety of the Statement of Facts was correct.

(*Id*. at 26-27).  Defendant confirmed that he had read the Statement of Facts prior to signing and had heard Task Force Officer Minnich read the Statement of Facts out loud. (*Id*.)  Defendant further confirmed that everything written in the Statement of Facts and read by Task Force Officer Minnich was correct in its entirety.  (*Id*.)

The Court then, once again, inquired of Defendant regarding his decision to plead guilty, to ensure that the decision was entirely knowing, voluntary, and uncoerced:

> **THE COURT: Are you offering to plead guilty here today because you're, in fact, guilty of the offense charged in Count 2 of the Superseding Indictment?**
>
> **DEFENDANT: Yes, Your Honor.**
>
> **THE COURT: You admit that you traveled across state lines with the intent to engage in a sexual act with Minor One, who was under the age of 12 at the time; is that right?**
>
> **DEFENDANT: Yes, Your Honor.**
>
> THE COURT: Very well.  **Nobody's threatened you that you need to enter your plea of guilty?**
>
> **DEFENDANT: Nobody has threatened me, Your Honor.**
>
> **THE COURT: Nobody has employed force against you which is making you plead guilty?**
>
> **DEFENDANT: No, Your Honor.**
>
> THE COURT: Nothing I've said or done is making you plead guilty?
>
> DEFENDANT: No, Your Honor.
>
> **THE COURT: So your decision to plead guilty is your own free and voluntary act; correct?**
>
> **DEFENDANT: Correct, Your Honor.**

(*Id*. at 27) (emphasis added).

The Court once again asked Defendant how he intends to plead, to which Defendant affirmatively entered his guilty plea to Count 2 of the Superseding Indictment. (*Id*. at 27-28). Based on the Court's observations of Defendant's appearance and responsiveness in answering all of the questions asked, the Court found that Defendant was fully competent and capable of entering an informed plea, and that Defendant's plea of guilty was a knowing and voluntary plea, supported by an independent basis in fact, containing each of the essential elements of the offense charged. (*Id*. at 28).

Accordingly, the Court accepted Defendant's plea of guilty and made a finding of guilty. (*Id*.) The Court deferred acceptance of the parties' proposed binding sentence under the Rule 11(c)(1)(C) plea agreement until sentencing, by which time the Court would have received and reviewed the Presentence Investigation Report ("PSR"). (*Id*. at 28-29). Finally, the Court ordered the preparation of the PSR to commence. (*Id*. at 28).

As ordered, the preparation of the PSR commenced immediately. (Doc. 106). The Probation Officer conducted a presentence investigation interview with Defendant, in the presence of his counsel, Mr. Tierney, on July 2, 2019. And the initial PSR was disclosed to the parties on August 21, 2019. The initial PSR indicates that, during the interview with the Probation Officer, Defendant "provided a statement wherein the defendant admitted involvement in the offense pursuant to the Statement of Facts."[4]

---

[4] PSR preparation was subsequently stayed due to Defendant's request for new counsel and the instant motion. Accordingly, there is no Final PSR to date, and the Court has before it only the initial version, which is typically disclosed to the parties for review and objections.

### B. Request for New Counsel and Motion to Withdraw the Plea

On September 30, 2019, the Court received Defendant's first *pro se* communications, asking to withdraw his guilty plea, as well as a separate letter and *pro se* memorandum in which Defendant again asked to withdraw his plea and requested the appointment of new counsel. As Defendant was represented by counsel (Kevin Tierney) and was therefore not *pro se*, the Court emailed the correspondence to Mr. Tierney on October 1, 2019, with copy to the Government. In that October 1, 2019 email, the Court stated that it would set the matter for an in-person status conference, at which time Defendant would have the opportunity to address the Court and advise how he wished to proceed. Accounting for the parties' schedules, the availability of new counsel (should the Court ultimately grant new counsel), and in an effort to give Mr. Tierney sufficient time to meet and confer with Defendant prior to the conference, the Court and the parties selected an in-person status conference date of October 31, 2019.

On October 7, 2019, the Court received another letter from Defendant. In this letter, Defendant informed the Court that he had received a letter from psychologist, David Lowenstein, Ph.D. As previously noted, Mr. Tierney had intended to call Dr. Lowenstein as an expert witness at trial, but the Court excluded that testimony by way of its May 24, 2019 oral ruling. (Doc. 116). In Dr. Lowenstein's letter to Defendant, which Defendant attached for the Court's review, Dr. Lowenstein (who is **not** a lawyer) offers Defendant legal advice on the propriety of Defendant's conviction, the sufficiency of the Government's evidence, and the alleged errors committed by trial counsel.

12

Of note in the letter, Dr. Lowenstein tells Defendant: "you need to fight this conviction as your case was handled poorly by your last attorney"; "the evidence against you was bad and the fact that I was not able to testify was the biggest error as my testimony should have been considered" and also that the exclusion of his testimony was defense counsel's "screw-up"; "the video of the 2 boys being coached … was the information that would throw your case out of Court"; "I had scheduled myself to be at your trial in June and was prepared to convince everyone that this was a set-up and that the only thing that needed to be done was to get the 'professionals' who had already [decided] you had sexually abused these boys to be thrown out and for us to start again if possible";[5] and that "[i]f you are going to fight this case then you need to start the process with me ASAP so that you can get a new trial, etc."  Dr. Lowenstein also repeatedly insists that he should immediately conduct an evaluation of Defendant, without any explanation of why an evaluation of <u>Defendant</u> would logically correlate to his purported expert testimony regarding the psychology of children in forensic interviews.

The Court, however, finds <u>the very last sentence of Dr. Lowenstein's letter to be the most telling of his motives</u>: "**What are the chances you can get the funds soon?**".[6] (Emphasis added).

---

[5] The Court is unclear as to the identity of the unnamed "professionals" who Dr. Lowenstein intends to "throw[] out" for having decided Defendant's guilt.

[6] Subsequently, on January 7, 2020, Dr. Lowenstein wrote a similar letter to current defense counsel, Thomas Kidd, in which Dr. Lowenstein once again opines on the performance of former trial counsel, the significance of his own testimony, and insists that he should evaluate Defendant right away.  (Doc. 111-2).

Immediately upon receipt, the Court forwarded Defendant's October 7, 2019 communication and Dr. Lowenstein's letter to Mr. Tierney via email. The Court further expedited the previously scheduled October 31, 2019 hearing to October 22, 2019.

On October 22, 2019, the Court held the in-person status conference. (Min. Entry, Oct. 22, 2019). Defendant was present with counsel, Mr. Tierney. (*Id*.) Also present, at the Court's request, was Thomas Kidd, Esq., a member of the Cincinnati Criminal Justice Act panel. The Court specifically requested that Mr. Kidd be present, in the event that the Court granted Defendant new counsel. And, indeed, at Defendant's request, the Court granted Mr. Tierney leave to withdraw and appointed Mr. Kidd as counsel of record. (*Id*.; Doc. 109).

Thereafter, the Court held a telephone status conference on November 15, 2019, at which time Mr. Kidd definitively stated Defendant's intent to withdraw his plea, and the Court established a briefing schedule accordingly. The instant motion followed, and briefing was complete by March 6, 2020. (Docs. 111, 113, 114).

## II. STANDARD OF REVIEW

"A guilty plea is valid if it is entered knowingly, voluntarily, and intelligently by the defendant." *United States v. Dixon,* 479 F.3d 431, 434 (6th Cir. 2007) (citing *Brady v. United States,* 397 U.S. 742, 748 (1970)). To ensure the validity of a plea, the Court must conduct a colloquy, pursuant to Fed. R. Crim. P. 11(b), and "verify that [the] defendant's plea is voluntary and that the defendant understands his or her applicable constitutional rights, the nature of the crime charged, the consequences of the guilty plea, and the factual basis for concluding that the defendant committed the crime charged."

14

*Dixon,* 479 F.3d at 434 (quoting *United States v. Webb,* 403 F.3d 373, 378–79 (6th Cir. 2005)). If the Court "scrupulously follow[s] the required procedure [under Rule 11], the defendant is bound by his statements in response to that court's inquiry." *Ramos v. Rogers,* 170 F.3d 560, 566 (6th Cir. 1999) (quoting *Baker v. United States,* 781 F.2d 85, 90 (6th Cir. 1986)).

Withdrawal of a valid guilty plea "is not an absolute right but is a matter within the broad discretion of the district court." *United States v. Sullivan*, 751 F. App'x 799, 807 (6th Cir. 2018) (quoting *United States v. Kirkland*, 578 F.2d 170, 172 (6th Cir. 1978) (per curiam)). Thus, after the Court has accepted a defendant's plea of guilty, it may be withdrawn prior to sentencing only if the defendant "can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). "The purpose of Rule 11(d) is to allow a 'hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty.'" *Dixon*, 479 F.3d at 436 (quoting *United States v. Alexander,* 948 F.2d 1002, 1004 (6th Cir. 1991)).

In determining whether the defendant has shown "a fair and just reason" to withdraw his plea, the Court must consider:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had

15

> prior experience with the criminal justice system; and (7)
> potential prejudice to the government if the motion
> to withdraw is granted.

*Sullivan*, 751 F. App'x at 807–08 (quoting *United States v. Bashara*, 27 F.3d 1174, 1181

(6th Cir. 1994)).  "No one factor controls; … [t]he relevance of each factor will vary

according to the 'circumstances surrounding the original entrance of the plea as well as

the motion to withdraw.'"  *United States v. Jackson*, 751 F. App'x 749, 751 (6th Cir.

2018) (quoting *United States v. Triplett*, 828 F.2d 1195, 1197 (6th Cir. 1987)).

### III.  ANALYSIS

In his motion to withdraw his plea, Defendant states that he agreed to enter into

the Rule 11(c)(1)(C) plea agreement after he was "thrown into a state of hopelessness due

to his failure to have an expert assist him in his defense …."  (Doc. 111 at 3).  Thus,

Defendant argues that his decision to plead guilty was caused by defense counsel's

alleged error in failing to timely disclose Dr. Lowenstein as an expert.  (*Id*. at 9-10).

Defendant also generally asserts that his attorney was unprepared to proceed to trial.  (*Id*.)

The Government opposes Defendant's motion, arguing that the Sixth Circuit's

seven-factor inquiry weighs against Defendant.  As set forth below, the Court agrees.

### A.  The Time Between the Plea and the Motion to Withdraw

"The shorter the delay, the more likely a motion to withdraw will be granted, and a

defendant's reasons for filing such a motion will be more closely scrutinized when he has

delayed his motion for a substantial length of time."  *United States v. Ellis*, 470 F.3d 275,

281 (6th Cir. 2006) (quoting *United States v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996)).

Here, Defendant voiced his intent to withdraw his plea in his first *pro se* communication to the Court, dated September 30, 2019—four months (or 119 days) after his plea hearing.[7] The Sixth Circuit has "consistently found shorter periods [(*e.g.*, 77-days, 67-days, 36-days)] to be excessive." *See United States v. Martin*, 668 F.3d 787, 795 (6th Cir. 2012) (collecting cases).

The first factor weighs against withdrawal.

**B. Reason for Failing to Move to Withdraw Earlier**

Defendant alleges that the delay in moving to withdraw his plea was due to a strained relationship with his attorney, and because he was unaware of "the mechanism to attempt to withdraw a guilty plea [until] a meeting with his prior counsel on September 12, 2019," after which he promptly began to conduct research and prepare his *pro se* motion. (Doc. 111 at 6-7).

As an initial matter, "[a] lack of communication with counsel alone [] is insufficient justification for a delay, particularly when defense counsel was unaware of [Defendant's intent] to withdraw his plea." *Martin*, 668 F.3d at 795 (citing *United States v. McIntyre*, 381 F. App'x 535, 539 (6th Cir. 2010) ("The motion, however, did not claim that McIntyre was *prevented* from contacting his attorney. Thus, McIntyre offers no substantiated explanation for his delay in filing the motion); *United States v. Mise*, 27 F.

---

[7] The Court first received definitive notice through counsel of Defendant's intent to withdraw his plea during the Court's November 15, 2019 telephone status conference, and Defendant's formal motion to withdraw his plea (*i.e.*, the instant motion) was not filed until January 9, 2020 (Doc. 111). However, Defendant made his intentions known to the Court by way of his earlier *pro se* communications. Thus, in fairness to Defendant, the Court will utilize the date of his earliest communication in assessing the timing of Defendant's request.

App'x 408, 413 (6th Cir. 2001) ("at the plea hearing, Mise told the court, under oath, that he was 'more than satisfied' with his attorney. Thus, defense counsel cannot be faulted for counsel's unawareness [of Defendant's intent to withdraw his plea]")).

Here, Defendant unequivocally advised the Court, under oath, that he was fully satisfied with his attorney's advice and representation—particularly with regard to the plea agreement. (Doc. 110 at 18). And nothing before the Court indicates that Defendant was *prevented* from communicating with his attorney. Indeed, Defendant was in the presence of his counsel during the PSR interview on July 2, 2019, at which time Defendant again took responsibility for his criminal conduct. Given the severity of Defendant's circumstances, the Court is unpersuaded by the assertion that Defendant allowed a contentious relationship with counsel to stand in the way of withdrawing his guilty plea.

Moreover, while Defendant alleges that he was unaware of the precise mechanism for moving to withdrawing a plea, he does not, and cannot, argue that the option was entirely unknown to him. Indeed, the very first paragraph of his plea agreement states that "Defendant agrees to plead guilty to Count 2 of the Superseding Indictment … **and will not withdraw his plea**." (Doc. 105 at 1, ¶1) (emphasis added). And, notably, Defendant has evidenced throughout these proceedings that he is fully capable of conducting his own research and communicating with the Court *pro se*. Indeed, he did just that on September 30, 2019, when he mailed the Court an extensive *pro se* motion to withdraw his plea, which Defendant admits to having researched and prepared on his own. (*See* Doc. 111 at 7). Thus, the Court finds Defendant's claim that he was at the

18

mercy of his attorney in the very particular instance of learning "the mechanism to attempt to withdraw a guilty plea," to be unavailing.

Accordingly, the second factor weighs against withdrawal.

### C. Whether Defendant has Asserted or Maintained his Innocence

"Statements of guilt under oath at a plea hearing support the district judge's decision not to permit withdrawal." *Martin*, 668 F.3d at 796; *see also Mise*, 27 F. App'x at 414 ("the guilty plea transcript reveals that the district court exhaustively inquired of Mise if he understood the factual basis for his plea, and whether he understood about the voluntariness of his guilty plea, and received repeated assurances from Mise that he understood both").

During the change of plea colloquy, Defendant not only entered his guilty plea but also repeatedly admitted that he was in fact guilty of the conduct as alleged in Count 2. (Doc. 110 at 12, 19, 21, 27). The Court inquired as to Defendant's admissions on numerous occasions, including the following exchange:

> THE COURT: Are you offering to plead guilty here today because you're, in fact, guilty of the offense charged in Count 2 of the Superseding Indictment?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: **You admit that you traveled across state lines with the intent to engage in a sexual act with Minor One, who was under the age of 12 at the time; is that right?**
>
> DEFENDANT: **Yes, Your Honor.**

(*Id*. at 27).

19

The Court acknowledges that, prior to entering into the plea agreement, Defendant had essentially maintained his innocence throughout the proceedings. And while this fact might have weighed in Defendant's favor, the Court cannot simply ignore Defendant's repeated admissions, under oath, not only to the Statement of Facts but, more specifically, to the elements of the offense and the conduct alleged in Count 2, as well as his admission that he was pleading guilty because he was "in fact, guilty of the offense charged in Count 2 of the Superseding Indictment." (Doc. 110 at 12, 19, 21, 27). *See Mise*, 27 F. App'x at 414 ("'[t]he defendant's post plea claims of innocence mock his courtroom declarations of guilt under oath and at a time when the trial would proceed on the next day and during which he would have had the opportunity to challenge the credibility of the witnesses he raises in his letter'").

The Court therefore finds this factor is neutral, as it neither weighs against nor in favor of Defendant's motion to withdraw his plea.

### D. The Circumstances Underlying the Entry of the Guilty Plea

When the Court "scrupulously follow[s] the required procedure [under Rule 11], the defendant is bound by his statements in response to that court's inquiry." *Ramos*, 170 F.3d at 566 (quoting *Baker*, 781 F.2d at 90). Moreover, a defendant's affirmative responses to the Court are sufficient to establish that the defendant pled guilty knowingly and voluntarily. *See United States v. Gardner*, 417 F.3d 541, 544 (6th Cir. 2005) ("[T]here is no requirement that in order to rely on a defendant's answer in a guilty-plea colloquy to conclude that the defendant pleaded guilty knowingly and voluntarily, those answers must be lengthy and all-encompassing; a straight-forward and simple 'Yes, your

20

honor,' is sufficient to bind a defendant to its consequences." (quoting *United States v. Walker*, 160 F.3d 1078, 1096 (6th Cir. 1998)).

Here, there is no question that the Court conducted a thorough Rule 11 colloquy, and that Defendant was wholly responsive to the Court's inquiries.

Nonetheless, Defendant now asserts that, as his trial date approached, his confidence in his trial counsel weakened, and his attorney "provided him [(Defendant)] a bleak assessment of [his] chance of success at trial," which prompted Defendant to sign the plea agreement "[i]n despair and feeling like he had no other option[.]"  (Doc. 111 at 10).  Accordingly, Defendant argues that, "due to all these factors, especially the lack of expert services and confidence in his counsel, [his] plea was neither voluntary nor knowing."  (*Id*.)

Notably, however, "where a defendant is aware of the condition or reason for a plea withdrawal, at the time the guilty plea is entered, a case for withdrawal is weaker." *United States v. Spencer*, 836 F.2d 236, 239 (6th Cir. 1987) (citing *United States v. Usher*, 703 F.2d 956 (6th Cir. 1983)).  And Defendant's current assertions that he entered his guilty plea, in a state of distress, due to his counsel's alleged errors and failure to adequately prepare for trial were known to Defendant at the time of the plea hearing. Yet, Defendant made no mention of any of these concerns at the time of the plea colloquy, nor did he raise the issue immediately after the hearing.

Rather, during the plea colloquy, Defendant advised that: he was not suffering from any mental illness, that he was sober, that he had a clear head, and he knew what he was doing (Doc. 110 at 6); that he had thoroughly discussed the charges, his possible trial

21

strategy, and the decision to plead guilty with his attorney (*Id*. at 5-6); that he believed his attorney was fully informed about the facts and circumstances of his case (*Id*. at 18); and that he was satisfied with his attorney's representation (*Id*.).

Moreover, it bears noting that while Defendant entered into the *plea agreement* on Friday, May 31, 2019 (Doc. 105), he did not *plead guilty* until the following Monday, June 3, 2019 (Doc. 110).  Therefore, Defendant also had the benefit of the weekend, outside of his counsel's presence, to reconsider his decision to plead guilty.  Yet, even with that benefit of time, Defendant still appeared before this Court and unequivocally entered his plea knowingly and voluntarily.

Finally, the Court would be remiss if it did not address Defendant's allegations as to counsel's performance.  As to counsel's preparation for trial, this Court's perception was that counsel was well-prepared.  Counsel successfully pursued a number of motions *in limine*, proposed thoughtful jury instruction, and submitted extensive and significant exhibits for trial.

And as to the timing of Defendant's expert disclosure, the Court accepted counsel's reasonable explanation for the delay.  More importantly however, and as previously noted, <u>the Court did not exclude Dr. Lowenstein's testimony merely because of the timing</u>.  In fact, the Court took considerable issue with the admissibility of Dr. Lowenstein's testimony, noting repeatedly that the proposed testimony would <u>not</u> assist the jury and that its exclusion was <u>not</u> unduly prejudicial to the defense.  (*Id*. at 116 at 16-20).  Indeed, the Court specifically stated in its final ruling that:

> If I enforce Rule 16 and prohibit the expert from testifying, I am not crippling the defense. The information he seeks to testify to, even if I found it appropriate, can be adduced through other fact witnesses and through cross-examination of all of the witnesses. I have reviewed the written documents that the expert provided to the defense in 2016, and his findings are based upon, in essence, his observations of what the evidence reflects.

(*Id*. at 30).

Thus, Defendant is mistaken in his belief that Dr. Lowenstein would have testified if defense counsel had disclosed earlier. And, frankly, <u>Dr. Lowenstein is wholly mistaken in his belief that his testimony was the silver bullet in this case</u>.

And, with regard to the Court's determination that Dr. Lowenstein's anticipated testimony would be of little to no assistance to the jury, it bears noting that the Court had previously made a nearly identical determination, in the context of the Order Denying Defendant's Motion for Reconsideration. Specifically, Defendant had previously argued for dismissal of all charges, based on the destruction of a document allegedly used to coach the minor victims. (Doc. 48). In finding that the destruction of the document did not amount to a due process violation, the Court held that:

> [T]he document's value would have been in undermining the credibility of the Government's potential witnesses—whether the minors, the parents, or Ms. Whittaker—and potentially casting doubt on the reliability of the investigation. However, even if the document somehow definitively established that the minors were fed information regarding Defendant's prior criminal conduct, that would not prove that the minors' disclosures regarding their own alleged abuses were false. Moreover, one of the minors in this case stated, in his recorded forensic interview, that a document existed, that it contained information regarding Defendant's criminal history, and that highlighted sections of the document were read to them. In

23

> light of the recorded acknowledgments of the minor, it seems the actual document would be redundant, at best. Frankly, the Court can think of no better means of impeachment than the minor's own statement referencing the document.

(Doc. 81 at 26).

Similarly, here, all of the recorded interviews spoke for themselves. Indeed, Dr. Lowenstein admits as much in his January 7, 2020 letter to current defense counsel, in which Dr. Lowenstein states:

> I had reviewed the video tapes of the children, and also the video recording that the aunt and mother produced of the two boys. **In that video, <u>it seemed evident that the children were coached</u>.**
>
> …
>
> [S]omeone should more fully examine the video of the children talking to their mother and aunt, when **<u>it appears they are clearly being coached</u> as evidenced by their use of notes and the children being told what to say and how to say things by these two adults**.

(Doc. 111-2) (emphasis added). Notably, neither in the disclosure of his anticipated testimony, nor in the 2016 initial report that he himself drafted, nor in any of the subsequent letters that he himself wrote, does Dr. Lowenstein ever make any mention of testifying to subject matter other than what is <u>plainly obvious</u> from the content of the videos.

For the foregoing reasons, the Court finds that the circumstances of the plea weigh against Defendant.

### E.  Defendant's Nature and Background

At the time of his plea, Defendant was 49 years old.  (Doc. 110 at 4).  He is a U.S. citizen, born and raised in the United States.  (*Id*. at 6; Doc. 108 at 1-2).  And he is an educated man who held steady employment for years prior to incarceration.  (*Id*. at 2; Doc. 110 at 4; Doc. 111 at 11).  During the plea colloquy, Defendant advised that he had never been treated for mental illness (Doc. 110 at 6), and Defendant did not report any mental health concerns to Pretrial Officers in 2016 (Doc. 108 at 3), nor to the Probation Officer in July 2019 (Initial PSR at 17-18).  Defendant told Pretrial and Probation Officers that he does not consume alcohol, and has never used illegal drugs.  (Doc. 108 at 3; Initial PSR at 18).  In other words, Defendant is a literate, competent, educated, and capable adult.

Defendant asserts that his time detained pretrial had weakened his emotional state and diminished his capacity.  (Doc. 111 at 11).

As an initial matter, the instant offense is not Defendant's first time being incarcerated, as he was previously sentenced to two-years imprisonment for his prior conviction, and subsequently arrested three times for violating the terms of his supervision, resulting in an additional five-months of incarceration for the last violation in December 2008.  *See State of Ohio v. Jory Leedy*, Montgomery Co. C.P. No. 2002 CR 2271 (filed Jun. 28, 2002); (Initial PSR at 13).  Nevertheless, the Court does not dispute that incarceration undoubtedly takes a mental and emotional toll on a person.  But the Court rejects the notion that detained defendants may develop mental health issues, which issues they themselves are aware of, but adamantly deny under oath, and which

nonetheless render them legally incompetent or incapable of entering an informed plea. While the Court does not intend to diminish the difficulties of incarceration, Defendant's assertion is simply without merit.

Accordingly, Defendant's nature and background weighs against withdrawal of the plea.

### F.  Degree of Defendant's Prior Experience with the Criminal Justice System

The instant case is not Defendant's first interaction with the criminal justice system, nor is it his first conviction, nor is it even his first conviction involving sexual abuse of a minor.  (Doc. 108 at 4).  Indeed, in 2002, Defendant was found guilty of two counts of gross sexual imposition involving a minor, after entering pleas of no contest. *State of Ohio v. Jory Leedy*, Montgomery Co. C.P. No. 2002 CR 2271 (filed Jun. 28, 2002).

Notably, not only does Defendant's criminal history indicate his familiarity with the justice system, but his prior pleas of no-contest evidence that Defendant is aware of the consequences and implications of a <u>guilty</u> plea.  In other words, there is no question that Defendant was aware of the option to plead to an offense without admitting to the underlying conduct.  And while the Court assumes that this option was likely not offered to Defendant in the context of this case, the fact remains that Defendant's prior criminal history indicates his awareness of the differing implications behind a no-contest plea and a guilty plea.  Defendant unequivocally entered a guilty plea in the instant case.

Finally, Defendant's persistent *pro se* practices throughout these proceedings belie the assertion that he lacked the capacity or capability to understand and exercise the options available to him.

Accordingly, Defendant's prior experience with the criminal justice system weighs against withdrawal of his plea.

### G.  Potential Prejudice to the Government if the Plea is Withdrawn

Defendant argues that there would be little prejudice to the Government if trial were to proceed at this time, because it is doubtful that any evidence has been lost.  (Doc. 111 at 12).  However, as the Government notes, this case involves the testimony of three alleged victims, two of whom are still minors.  (Doc. 113 at 11).  These individuals have already endured trial preparation once, and it would undoubtedly pose a significant hardship on them to be drawn back a second time.

That said, the Court recognizes that ensuring a defendant's right to confront witnesses is fundamental to a fair trial.

Accordingly, the Court finds this factor neutral, in that it neither weighs in favor of nor against Defendant.

### IV.  CONCLUSION

Based upon the foregoing, the Court finds that five of the seven applicable factors weigh against granting Defendant's motion, and the remaining two factors are neutral, at best.  Moreover, the Court finds that its strict adherence to the requirements of Rule 11, and Defendant's appearance and responsiveness to the Court's inquiries, ensured that Defendant's guilty plea was knowing and voluntary.

27

The Court therefore finds that Defendant has failed to show a "fair and just reason" why this Court should allow him to withdraw his guilty plea.  Accordingly, Defendant's motion to withdraw his guilty plea (Doc. 111) is **DENIED**.

      **IT IS SO ORDERED.**

Date: 12/30/2020

Timothy S. Black
United States District Judge