# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:16-cr-036 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| JORY LEEDY, | : | |
| | : | |
| Defendant. | : | |

## ORDER DENYING DEFENDANT'S MOTION TO VACATE PURSUANT TO 28 U.S.C. § 2255

This criminal case is before the Court on Defendant Jory Leedy's motion to vacate his judgment and sentence, pursuant to 28 U.S.C. § 2255. (Doc. 135).[1]

## I. BACKGROUND

On April 20, 2016, Defendant Jory Leedy was charged by way of Indictment with two counts of aggravated sexual abuse of a child under the age of twelve, in violation of 18 U.S.C. § 2241(c) (Counts 1 and 2). (Doc. 11). A Superseding Indictment, filed on December 21, 2016, added one additional count of the same offense. (Doc. 51). The

---

[1] The Government sought and was granted three extensions of time to file a response in opposition, but no response was filed. (Docs. 136, 137, 139; Not. Orders, Aug. 1, 2022, Aug. 30, 2022, Sep. 16, 2022). Having received no response, Defendant moved for default judgment. (Doc. 140). However, Defendant's § 2255 motion (Doc. 135) shall be decided on its merits, with or without a response from the Government. Moreover, pursuant to Rule 5(a) Governing § 2255 Proceedings, the Government "is not required to answer [a § 2255] motion unless a judge so orders." Here, the Government expressed its independent intent to respond and was given additional time to do so. But the Court did not order the Government to respond as an initial matter and, therefore, finds no basis to penalize the Government for failing to file a response that was never required in the first instance. Accordingly, Defendant's motion for default judgment is DENIED. (Doc. 140).

new charge became Count 1 of the Superseding Indictment, and the two counts charged in the original indictment became Counts 2 and 3 of the Superseding Indictment. (*Id*.)[2]

As charged in the Superseding Indictment, Defendant faced a statutory maximum term of life imprisonment as to Count 1. (*Id*. at 1); 18 U.S.C. § 2241(c) (eff. Oct. 30, 1998 to Jan. 4, 2006).[3] As to Counts 2 and 3, the statutory penalties call for a mandatory minimum term of 30 years imprisonment up to life, unless the Court determined that Defendant's prior conviction constituted a predicate offense for purposes of the statutory sentencing enhancement, which enhancement would require the Court to impose a mandatory life sentence.[4] (Doc. 51); 18 U.S.C. § 2241(c).

---

[2] The victims of Counts 2 and 3 are siblings who were 10 and 9 years old, respectively, at the time of Defendant's arrest (and are still minors as of the issuance of this Order). To protect their privacy, and to remain consistent with the Court's pretrial Orders, the Court will continue to refer to the minors as "Minor 1" and "Minor 2," and, collectively, the "minors." A Victim Identification Chart with the minors names and dates of birth is filed under seal at Doc. 72.

[3] The conduct charged in Count 1 of the Superseding Indictment was alleged to have occurred between January 1, 1999 and June 1, 2001. (Doc. 51 at 1). At the time of the alleged conduct, the statutory penalty for the offense was "any term of years or life." 18 U.S.C. § 2241(c) (eff. Oct. 30, 1998 to Jan. 4, 2006). The statute was subsequently amended, increasing the penalty to a mandatory minimum of 30 years imprisonment up to life. 18 U.S.C. § 2241(c) (amended Jul. 27, 2006).

[4] In or around 2002, Defendant was convicted in an unrelated case of two counts of gross sexual imposition involving a child under the age of 13 (specifically, an 11-year-old). *See State of Ohio v. Jory Leedy*, Montgomery Co. C.P. No. 2002 CR 2271 (filed Jun. 28, 2002). Because the conduct charged in Counts 2 and 3 were alleged to have occurred between March 1, 2014 and September 1, 2015—*i.e.*, after Defendant's 2002 convictions—Counts 2 and 3 were subject to the enhanced penalty of a mandatory life sentence. (Doc. 51 at 1-2); 18 U.S.C. § 2241(c). In a pretrial motion, Defendant argued that his prior convictions did not qualify as Section 2241(c) predicate offenses. (Doc. 41). The Court deferred decision on that motion, finding that "the applicability of the recidivist enhancement … [was] not yet ripe for decision, as adjudication of the matter [wa]s contingent upon a future event …." (Doc. 87 at 5). The Court's subsequent acceptance of Defendant's Fed. R. Crim. P. 11(c)(1)(C) plea agreement mooted the question of the recidivist enhancement.

Defendant was initially represented in this case by Richard Monahan, Esq., of the Federal Public Defender's Office. (Doc. 17). But in September 2016, Mr. Monahan was granted leave to withdraw due to a conflict of interest, and the Court appointed Kevin Tierney, Esq., under the Criminal Justice Act (the "CJA"). (Doc. 35). Mr. Tierney served as defense counsel for the vast majority of the proceedings. However, as discussed *infra*, in October 2019, at Defendant's request, the Court granted Mr. Tierney leave to withdraw and appointed new CJA counsel, Thomas Kidd, Esq. (Doc. 109).

During the pretrial proceedings, this Court issued a number of detailed Orders resolving the parties' substantive pretrial motions, including, relevant here: Order granting Defendant's motion for discovery (Doc. 37); Orders denying Defendant's motion to dismiss and motion for reconsideration relating to spoliation and alleged prosecutorial misconduct (Docs. 46, 81); oral ruling denying Defendant's motion to dismiss on speedy trial grounds (Doc. 78); Order denying motion to suppress based on adequacy of the search warrant and affidavit, as well as a request for a *Franks* hearing (Doc. 83); Order denying Defendant's motion for a Bill of Particulars (Doc. 86); oral ruling granting the Government's motion to exclude Defendant's proposed expert witness, pursuant to Fed. R. Crim. P. 16 (Doc. 116); oral ruling denying in part Defendant's motion *in limine* to exclude evidence of Defendant's prior offense, pursuant to Fed. R. Evid. 414 (Doc. 116; Min. Entry & Not. Order, May 29, 2019); and Order denying Defendant's motion to withdraw his guilty plea (Doc. 117).

After resolving pretrial motions, the Court held the Final Pretrial Conference on Wednesday, May 29, 2019, with jury trial scheduled to commence on Monday, June 3, 2019. (Doc. 88; Min. Entry, May 29, 2019).

However, on Friday, May 31, 2019, the Court received notice that Defendant had entered into a plea agreement, and the executed agreement was filed on the docket later that afternoon. (Doc. 105). Specifically, Defendant entered into a Rule 11(c)(1)(C) plea agreement, in which he agreed to plead guilty to Count 2 of the Superseding Indictment, in exchange for a proposed binding sentence of 30 years imprisonment and at least five years of supervised release (*Id*. at 2-6; Doc. 105 at ¶ 7). Additionally, Defendant's plea agreement included an explicit Waiver of Appeal provision, which provision states as follows:

> In exchange for the concessions made by the USAO in this plea agreement, the Defendant waives the right to appeal the sentence imposed, except if the sentence imposed exceeds the statutory maximum. Defendant also waives the right to attack his conviction or sentence collaterally, such as by way of a motion brought under 28 U.S.C. § 2255. However, this waiver shall not be construed to bar a claim by the Defendant of ineffective assistance of counsel or prosecutorial misconduct.

(Doc. 105 at 3, ¶ 10).

Upon receipt of the plea agreement, the Court advised the parties that it would address Defendant's intent to change his plea, and would proceed with a change of plea hearing (if and as appropriate), on June 3, 2019, immediately prior to *voir dire*. Notably, in an abundance of caution, the Court neither vacated the trial date, nor did it recall the summons to prospective jurors. In other words, on the morning of June 3, 2019, the

4

Court was ready and willing to proceed to trial as scheduled, in the event that Defendant ultimately elected not to enter a guilty plea.

On the morning of June 3, 2019, outside the presence of prospective jurors, the Court conferred with the parties on the record, in open court, regarding how Defendant intended to proceed.  (Doc. 110 at 2-3).  At that time, Defendant confirmed his intent to plead guilty, pursuant to the filed Rule 11(c)(1)(C) plea agreement.  (*Id*. at 2-6; Doc. 105 at ¶ 7).  Upon Defendant's oral motion to enter a guilty plea, the Court proceeded to hold a thorough Rule 11 plea colloquy.  (Doc. 110 at 3-4).  At the conclusion of the plea colloquy, the Court accepted Defendant's plea of guilty and made a finding of guilty.  (*Id*. at 28-29).  The Court deferred acceptance of the parties' proposed binding sentence until the Court received and reviewed the Presentence Investigation Report ("PSR"), the preparation of which was ordered to commence immediately.  (*Id*.; Doc. 106).

On July 2, 2019, the Probation Officer conducted a PSR interview with Defendant, in the presence of his counsel, Mr. Tierney.  The initial PSR was then disclosed to the parties on August 21, 2019 (filed on the docket on January 2021).  (Doc. 118 at 2).[5]

---

[5] Notably, the initial PSR indicates that, during Defendant's interview with the Probation Officer, Defendant "provided a statement wherein the defendant admitted involvement in the offense pursuant to the Statement of Facts."  (Doc. 118 at 9, ¶ 41).  As a result, Defendant initially received the total 3-point reduction in his offense level computation for timely acceptance of responsibility.  (*Id*. at 12, ¶¶ 68-69).  Indeed, in December 2019, this Court's Order denying Defendant's motion to withdraw his plea specifically cited to the initial PSR and noted Defendant's acceptance of responsibility.  (Doc. 117 at 11, 18).  However, following the issuance of the Court's Order and recommencement of the PSR's preparation, Defendant made a revised statement to the Probation Officer, in which he said that he "continues to deny any criminal conduct and maintains that he is not guilty to the conduct alleged."  (Doc. 121 at 10, ¶ 41).  Defendant's revised statement resulted in the Probation Officer revoking the 3-point offense level reduction for acceptance of responsibility.  (*Id*. at 12-13, ¶¶ 68, 69).

However, on September 30, 2019, the Court received Defendant's first *pro se* communications, asking to withdraw his guilty plea, as well as a separate letter and *pro se* memorandum in which Defendant again asked to withdraw his plea and requested the appointment of new counsel.  As Defendant was represented by counsel at the time, and was therefore not *pro se*, the Court emailed the correspondence to Mr. Tierney on October 1, 2019, with copy to the Government.  Additionally, the Court scheduled a hearing for October 22, 2019, in order to allow Defendant to be heard while in the presence of counsel.  (Min. Entry, Oct. 22, 2019).  During the hearing, Defendant maintained his request for new counsel and, accordingly, the Court granted Mr. Tierney leave to withdraw and appointed Mr. Kidd as counsel of record.  (*Id.*; Doc. 109).

Thereafter, the Court held a telephone status conference with the parties on November 15, 2019, at which time Mr. Kidd definitively stated Defendant's intent to withdraw his plea.  Accordingly, the Court stayed preparation of the PSR and established a briefing schedule on Defendant's impending motion.

Briefing on Defendant's motion to withdraw his plea was ultimately completed in March 2020.  And the Court issued an Order denying the motion in December 2020. (Doc. 117).

After denying Defendant's motion to withdraw his plea, the Court reestablished the PSR preparation schedule.  (Not. Order, Jan. 4, 2021).  The Final PSR was disclosed in March 2021 (Doc. 121), and the case proceeded to sentencing on June 10, 2021 (Min. Entry, Jun. 10, 2021).

At the time of sentencing, the Court addressed and overruled Defendant's objections to the PSR and his continuing request to withdraw his plea.  (*Id*.)  The Court accepted the Rule 11(c)(1)(C) plea agreement's proposed binding sentence and, accordingly, sentenced Defendant to 360 months imprisonment, followed by ten years of supervised release.  (*Id*.; Doc. 124).

Following entry of his Judgment of Conviction, Defendant filed a timely Notice of Appeal to the Sixth Circuit Court of Appeals on June 24, 2021.  (Doc. 126).  On September 1, 2021, the Sixth Circuit appointed Jeffrey Nunnari, Esq., to serve as Defendant's appellate counsel under the CJA.  *United States v. Jory Leedy*, No. 21-3573 (6th Cir., Doc. 10, Sep. 1, 2021).  Despite having just received appointed counsel, Defendant sent a *pro se* letter to the Sixth Circuit, dated September 27, 2021, in which he expressed his desire to file his own appellate brief.  (*Id*. at 6th Cir. Doc. 21).  As Defendant was represented, the Sixth Circuit responded that all filings must be submitted through counsel and that *pro se* pleadings would not be accepted.  (*Id*. at 6th Cir. Doc. 22).

On November 15, 2021, Mr. Nunnari filed an *Anders* brief and a motion seeking leave to withdraw as counsel.  (*Id*. at 6th Cir. Docs. 23, 24). Specifically, Mr. Nunnari stated that he had conducted a review of the trial court record and found no meritorious grounds for appeal, but identified two arguable issues: this Court's decision denying Defendant's motion to withdraw his guilty plea; and the validity of Defendant's appellate waiver.  (*Id*.)

7

Further, in compliance with Sixth Circuit Rule 12(c)(4)(C), Mr. Nunnari served a copy of his motion to withdraw and *Anders* brief on Defendant, along with copies of Defendant's plea and sentencing transcripts, and specifically advised Defendant that: "You now have the opportunity to **file your own brief, raising whatever issue or issues you feel are warranted**. You have 21 days from the date of this letter to do so." (*Id*. at 6th Cir. Doc. 25 at 4) (emphasis added). On December 9, 2021, Defendant filed a *pro se* motion for an extension of time to respond to the *Anders* brief, and was granted an additional 45-days. (*Id*. at 6th Cir. Docs. 25, 27). Notably, in his motion for extension of time, Defendant attached a copy of Mr. Nunnari's letter and specifically quoted Mr. Nunnari's statement regarding Defendant now being able to file his own brief. (*Id*. at 6th Cir. Doc. 25).

On January 19, 2022, Defendant filed his *pro se* Brief in Support of Reversal of Conviction in Response to *Anders* Brief Filed by Counsel. (*Id*. at 6th Cir. Doc. 28). Thereafter, Defendant also sent a *pro se* letter to the Sixth Circuit requesting documents on March 11, 2022, and then a subsequent *pro se* supplemental responsive brief on March 24, 2022, an amended *pro se* supplemental responsive brief on March 25, 2022, and a *pro se* notice to correct minor errors he made in his prior filings on April 15, 2022. (*Id*. at 6th Cir. Docs. 32, 33, 34, 35).

In his *pro se* responsive briefs, Defendant asserted claims relating to: (1) this Court's denial of his motion to reconsider dismissal for prosecutorial misconduct and his motion to dismiss on speedy trial grounds; (2) ineffective assistance of counsel—specifically as to alleged error resulting in the exclusion of the defense's proposed expert

witness; (3) prosecutorial misconduct; and (4) the validity of the arrest warrant.  (*Id*. at 6th Cir. Docs. 28, 33, 34).[6]

On April 19, 2022, the Sixth Circuit issued its decision granting Defendant's appellate counsel leave to withdraw, denying the appointment of new appellate counsel, and dismissing Defendant's appeal as frivolous.  (Doc. 133).[7]

Specifically, the Sixth Circuit's Order explained that Defendant entered a valid, unconditional guilty plea, and thereby waived any constitutional violations that may have occurred prior to his plea of guilty.  (*Id*. at 7) (citing *United States v. Lalonde*, 509 F.3d 750, 757 (6th Cir. 2007); *Tollett v. Henderson*, 411 U.S. 258, 267 (1973)).  The Sixth Circuit noted that Defendant's plea agreement included an express appellate waiver, and further determined, upon *de novo* review, that Defendant was bound by the appellate waiver, having entered into the agreement knowingly and voluntarily.  (Doc. 133 at 3-4). Additionally, upon reviewing this Court's decision to deny Defendant's motion to withdraw his plea, the Sixth Circuit concluded that "any assertion that the district court abused its discretion when it denied [Defendant's] motion to withdraw his guilty plea would be frivolous."  (*Id*. at 8-10).  Thus, the Sixth Circuit declined to consider Defendant's claims relating to discovery, speedy trial, and the arrest warrant, having

---

[6] In sum, Defendant's briefs, which were submitted as "responses" to the *Anders* brief, identified specifically the issues he believed warranted consideration on appeal, including citations to related documents in the extensive pretrial record.  *See Leedy*, No. 21-3573 (Docs. 28, 33, 34, 35).  Thus, the filings served many of the purposes of an appellate brief, absent formal legal arguments.

[7] The Sixth Circuit's Order was filed as Doc. 36 on the appellate court docket.  *See Leedy*, No. 21-3573 (Doc. 36, Apr. 19, 2022).  The Court's citation to Doc. 133 references the identical copy of the Sixth Circuit's Order filed on the docket of this Court.

determined that Defendant "entered an unconditional guilty plea without reserving the right to appeal any pre-plea issues, except ineffective assistance of counsel and prosecutorial misconduct …." (*Id*. at 7-8).

As to the two excepted categories of claims, the Sixth Circuit declined to consider Defendant's ineffective assistance of counsel claims further, as the claims were premature on direct appeal. (*Id*. at 4-5). And as to the question of prosecutorial misconduct, the Sixth Circuit expressed its dismay that appointed appellate counsel had failed to identify the issue in his *Anders* brief. (*Id*. at 5). Nevertheless, the Sixth Circuit conducted its own review of the prosecutorial misconduct issue, including reviewing the trial court record (and specifically referencing the several filings Defendant cited in his responsive briefs), and concluded that an appeal of the issue would be "wholly frivolous" and "would surely fail on the merits." (*Id*.)

In sum, the Sixth Circuit ruled that it had "thoroughly reviewed the record in this case and discovered no error warranting reversal of the district court's judgment[,] … [and] that there are no issues of arguable merit present in [Defendant's] appeal." (*Id*. at 11). Accordingly, the Sixth Circuit granted Defendant's appellate counsel leave to withdraw, denied Defendant appointment of new appellate counsel, and affirmed this Court's judgment. (*Id*.)

Following the dismissal of his appeal, Defendant timely filed the instant motion to vacate, pursuant to 28 U.S.C. § 2255. (Doc. 135).

## II.  STANDARD OF REVIEW

A court must vacate and set aside a judgment or sentence if it finds "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."  28 U.S.C. § 2255(b).  Accordingly, a motion for relief under § 2255 must allege either: "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid."  *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001) (citing *United States v. Addonizio*, 442 U.S. 178, 185-86 (1979)).  In other words, "[r]elief is warranted only where a petitioner has shown 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (quoting *Davis v. United States,* 417 U.S. 333, 346 (1974)).  "Claims of ineffective assistance of counsel are appropriately brought … under section 2255."  *Griffin*, 330 F.3d at 736.

## III.  ANALYSIS

In his § 2255 motion, Defendant asserts thirteen claims for relief, including seven claims of ineffective assistance of trial counsel (Grounds 1 to 7); five claims of prosecutorial misconduct (Grounds 8-12); and one claim of ineffective assistance of appellate counsel (Ground 13).  (Doc. 135).

As fully explained below, the Court finds no merit in any of Defendant's claims, and thus the § 2255 motion must be denied.  Additionally, the Court notes that much of

Defendant's claims assert wrongdoing by either trial counsel or the prosecutor, based on issues that this Court substantively addressed and rejected in resolving Defendant's pretrial motions. In that regard, the Court will not entertain the re-litigation of these issues and will, instead, simply refer to its prior Orders.

### A. Ineffective Assistance of Trial Counsel – Grounds 1 to 7

To demonstrate ineffective assistance of counsel, the defendant must make two showings: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The Court is not required to "approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. Thus, if Defendant fails to satisfy either of the two prongs, his claim will fail. *Id*.

Under the first prong of the *Strickland* test, Defendant must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 688. However, counsel's representation is deficient only where it falls "below an objective standard of reasonableness." *Id*. There is no "checklist for judicial evaluation of attorney performance," but rather "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id*.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance …." *Id*. at 689. Thus, the *Strickland* analysis is not an opportunity to second-guess trial counsel's sound strategic decisions merely because

they were unsuccessful.  *Id.*; *White v. McAninch*, 235 F.3d 988, 995 (6th Cir. 2000).

"[T]he purpose of the effective assistance guarantee of the Sixth Amendment … is

simply to ensure that criminal defendants receive a fair trial."  *Strickland*, 466 U.S. at

689.  But "the Constitution guarantees competent counsel and a fair trial, not perfection."

*Scott v. Mitchell*, 209 F.3d 854, 881 (6th Cir. 2000); *Harrington v. Richter*, 562 U.S. 86,

110 (2011) ("*Strickland* does not guarantee perfect representation, only a 'reasonably

competent attorney'") (quoting *Strickland*, 466 U.S. at 686).

     Under the <u>second prong</u> of the *Strickland* test, Defendant "must show that there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."  466 U.S. at 694.  "A reasonable probability is a

probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  Defendant

does not have to show that "his counsel's deficient conduct more likely than not altered

the outcome in the case."  *Goza v. Welch*, 579 F. App'x. 367, 370 (6th Cir. 2014).

Instead, the question "is whether counsel's errors were serious enough to deprive the

[defendant] of a proceeding the result of which was 'reliable.'"  *Glenn v. Tate*, 71 F.3d

1204, 1210 (6th Cir. 1995) (quoting *Strickland*, 466 U.S. at 687).

     Additionally, the Supreme Court has outlined the application of *Strickland* to cases

involving alleged ineffective assistance with regard to guilty pleas:

> In the context of guilty pleas, the first half of the *Strickland v.
> Washington* test is nothing more than a restatement of the
> standard of attorney competence….  The second, or
> "prejudice," requirement, on the other hand, focuses on
> whether counsel's constitutionally ineffective performance
> affected the outcome of the plea process.  In other words, in
> order to satisfy the "prejudice" requirement, **the defendant**

<u>**must show that there is a reasonable probability that, but
for counsel's errors, he would not have pleaded guilty and
would have insisted on going to trial**</u>.

In many guilty plea cases, the "prejudice" inquiry will closely
resemble the inquiry engaged in by courts reviewing
ineffective-assistance challenges to convictions obtained
through a trial.  For example, where the alleged error of counsel
is a failure to investigate or discover potentially exculpatory
evidence, the determination whether the error "prejudiced" the
defendant by causing him to plead guilty rather than go to trial
will depend on the likelihood that discovery of the evidence
would have led counsel to change his recommendation as to
the plea.  This assessment, in turn, will depend in large part on
a prediction whether the evidence likely would have changed
the outcome of a trial.

*Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985) (emphasis added).

Defendant asserts seven claims of ineffective assistance of trial counsel, including:
(1) "failing to investigate and file a motion to suppress the arrest warrant"; (2) "failing to
investigate and file a motion to suppress the scripted, coached, and otherwise improperly
influenced and tainted allegations"; (3) "committing Rule 16 errors causing trial to be
forfeited and plea agreement entered instead"; (4) "failing to reassert speedy trial rights"; (5)
"failing to adequately explain waiver of appeal rights, and plea agreement was not
taken in compliance with Fed. R. Crim. P. 11"; (6) "advising to plead guilty after express
statement of will to maintain innocence"; and (7) "failing to pursue the issues of
prosecutorial misconduct and vindictiveness."  (Doc. 135 at 13-23, 30-59).

   *1. Failing to Investigate and File a Motion to Suppress the Arrest Warrant*

In Ground 1, Defendant asserts that trial counsel, Kevin Tierney, Esq., as well as
his prior counsel, Richard Monahan, Esq., failed to investigate and move to suppress the

14

arrest warrant, based on "multiple misrepresentations and omitted exculpatory information" in the warrant affidavit. (Doc. 135 at 13-17, 30-43). Defendant argues that the alleged deficiencies in the affidavit would have been "crucial" and "dispositive." (*Id.* at 30).

Defendant discusses, at length, the arguments that could have been made as to the validity of the arrest warrant—most notably, that the affidavit omits the fact that the minors' recounting of events were inconsistent over time, that there was some concern regarding the parents coaching the minors, and that the Children's Services caseworker may have told the minors (or told the parents in the minors' presence) information about Defendant's prior crimes and sex offender status. Defendant also argues that the minors' inconsistent statements alone were insufficient to provide probable cause. And thus Defendant faults his trial counsel for failing to challenge the arrest warrant on these grounds. Defendant's argument is unavailing.

To begin, Defendant's trial counsel did file a motion to suppress the **<u>search</u>** warrant, and in that context, raised all of these issues. (Docs. 22, 49). Notably, the search warrant affidavit and the arrest warrant affidavit are substantively identical. (*Compare* Doc. 1, *with* Doc. 29-1). Thus, this Court has already considered all of Defendant's arguments and rejected them by way of a written Order denying suppression of the search warrant. (Doc. 83). Specifically, the Court held as follows:

> The Court agrees that this information was not contained in the affidavit, but finds that, even if the omitted information were included, it would not have changed the probable cause determination.

> First, it is hardly surprising that two children (ages nine and ten at the time) may not have freely and openly disclosed—to a complete stranger conducting a forensic interview—all of the details of the minors' alleged sexual abuse. While any such inconsistencies may be fodder for cross-examination at trial, it is hardly sufficient here to undermine probable cause. This is so, in particular, given that the affidavit in this case contains an overwhelming amount of information to support a finding of probable cause.
>
> Second, the fact that the minors were aware of Defendant's criminal history and prior conduct does not render their own disclosures false. Defendant asserts that the similarity between the minors' disclosures and Defendant's past conduct evidences that the minors' disclosures were merely recitations of the information they heard, rather than truthful statements about actual abuse they had endured. However, any similarities could just as easily evidence a pattern of conduct by Defendant, which would only further support a finding of probable cause.

(Doc. 83 at 12-13).

The Court's Order also discussed and rejected the argument that the allegations contained in the affidavit were insufficient to support a probable cause finding as to Defendant's charged offenses. Specifically, while Defendant's § 2255 motion makes much of the fact that there was no physical evidence of abuse, this Court has already explained that "the relevant proscription under 18 U.S.C. § 2241(c) is 'cross[ing] a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years'…. There is no requirement that the sexual act occur." (Doc. 83 at 8). Thus, the notion that there is no physical evidence of sexual abuse is irrelevant. Moreover, there is, as detailed in the search and arrest warrant affidavits, overwhelming evidence of Defendant's unsupervised out-of-state travels with the two minors. (*See* Docs. 1 & 29-1).

16

Given the fact that the evidence in this case was obtained by way of the <u>search</u> <u>warrant</u> and **<u>not</u>** <u>the arrest warrant</u>, and given that this Court rejected the arguments as to validity of the substantively identical search warrant affidavit, trial counsel can hardly be faulted for not filing another motion and making the same arguments, only to attack an arrest warrant that was not used to obtain evidence (thereby leaving nothing to suppress). Moreover, Defendant was subsequently indicted (not once, but twice) by the Grand Jury, which found probable cause for the charged offenses. Thus, even if the Court had found the arrest warrant invalid, Defendant's Indictment and Superseding Indictment would still stand.

Accordingly, the Court finds that counsel did investigate and litigate the issues (albeit as to a different warrant), and counsels' decision to forego pursuing a frivolous and redundant motion was entirely appropriate. Thus, counsel was not deficient. Additionally, as the outcome of a motion to suppress the arrest warrant would have had no bearing on the outcome of Defendant's case, Defendant has suffered no prejudice.

In short, Defendant's claim fails both the first and second *Strickland* prongs, and the Court rejects Defendant's contention that trial counsel was ineffective for failing to investigate or move to suppress the arrest warrant.

2. *Failing to Investigate and File a Motion to Suppress the Minor's Allegations*

In Ground 2, Defendant relies on the allegations asserted in Ground 1 relating to the credibility of the minors' statements, and now argues that counsel "failed to

17

investigate those issues and challenge the illegally obtained allegations by filing a motion to suppress." (Doc. 135 at 18, 43-46).

As an initial matter, as evidenced by the extensive pre-trial motion practice relating to Defendant's motion to suppress, motion for discovery, motion to dismiss, and motion for reconsideration, trial counsel <u>by no means</u> "failed to investigate" the minors' statements. The issue was investigated and litigated thoroughly—just not in the frivolous manner that Defendant suggests. Thus, the Court rejects outright Defendant's assertion in this regard.

Additionally, Defendant fails to identify how the allegations (*i.e.*, the statements of the minor victims) were "illegally obtained" by law enforcement. Indeed, as established during a pretrial hearing on Defendant's motion to reconsider dismissal, law enforcement did not interview the minors, because the forensic interviews were conducted and recorded by Children's Services. (*See* Doc. 73 at 91-92, 97, 157). And in its Order denying Defendant's motion for reconsideration, this Court held that:

> [T]he Court cannot conclude that GCJFS [Greene County Job and Family Services] was part of the investigative or prosecution team, such that the Government should be held to answer for its conduct. Not every source of information utilized by law enforcement or the Government naturally become part of the team. … GCJFS is a county department offering benefits and public assistance to the local community. It does not function at the behest or direction of the federal prosecutors or law enforcement.

(Doc. 81 at 26-27) (internal citations omitted).

Given that neither the investigating law enforcement officers nor the prosecutors were responsible for obtaining the victims' statements, there is no basis upon which counsel could have moved to suppress the evidence.

Additionally, the Court finds no basis under the Rules of Evidence to exclude the testimony of a witness (let alone an underage sexual assault victim), solely because the witness gave inconsistent statements. Thus, a motion *in limine* to exclude the testimony would have been equally fruitless. And, again, the Court made this point abundantly clear in its pretrial Orders, by repeatedly emphasizing that the issues of inconsistency and coaching were fodder for impeachment, but were not sufficient to warrant dismissal. (*See*, *e.g.*, Doc. 81 at 26, 29; Doc. 83 at 12).

As counsel thoroughly investigated and litigated legitimate issues regarding the allegations, and as counsel has no obligation to file frivolous motions, the Court finds no deficiency in counsel's performance as to Ground 2. Additionally, because the Court addressed and rejected these arguments (again, albeit, in a different context), and as any attempt to exclude the minors' statements or their testimony would have been unsuccessful, Defendant has suffered no prejudice.

Having failed the first and second prongs of the *Strickland* test, the Court denies relief under Ground 2.

### 3. Rule 16 Error

In Ground 3, Defendant asserts that his trial counsel was ineffective for committing Rule 16 errors, which errors resulted in the Court excluding Defendant's proposed expert witness, David Lowenstein, Ph.D. (Doc. 135 at 18-20, 46-55).

19

Defendant argues that his "chances of success at trial relied heavily on [his] ability to present expert witness testimony in regard to the improper interview techniques and influences used with the Minors …," and that "the effects of [the improper influences] on the Minors' allegations and trial testimony, could only have been explained to a jury by a trained, qualified expert, such as Dr. Lowenstein." (*Id*. at 46, 47).

This Court's Order denying Defendant's motion to withdraw his plea already addressed the substance of Defendant's claim. (Doc. 117). Specifically, on May 20, 2019, roughly two weeks before trial was scheduled to commence, defense counsel provided the Government with notice that it intended to call Dr. Lowenstein as an expert witness, to testify based on "his specialized knowledge involving forensic interviewing of children in cases involving sexual abuse and the suggestibility of child witnesses." (Doc. 101-3 at 1). Defendant's former counsel, Mr. Monahan, had originally communicated with Dr. Lowenstein as a consulting expert in July 2016, at which time Dr. Lowenstein reviewed the videos of the minors' September and December 2015 forensic interviews, but not the home video of the minors' disclosures to their family. (Doc. 89 at 2; Doc. 116 at 8-9). Thereafter, Mr. Tierney reinitiated contact to secure Dr. Lowenstein as a proposed expert witness in early-March 2019—*i.e.*, after pretrial motions were all resolved and the case was definitively scheduled for trial. (Doc. 116 at 8-9; *see also* Doc. 88 (Criminal Trial Calendar, entered Feb. 20, 2019)).

On April 29, 2019—after some initial back and forth regarding Dr. Lowenstein's fees, and after counsel cleared all necessary administrative hurdles to secure CJA funding—counsel sent Dr. Lowenstein the minors' forensic interviews (which Dr.

Lowenstein had previously reviewed) and the home video of the minors' allegations on April 29, 2019. (Doc. 116 at 9-10).[8]

On Friday, May 17, 2019 (*i.e.*, nearly three weeks after receiving the videos, and just two weeks before trial was scheduled to commence), Dr. Lowenstein contacted Mr. Tierney to advise that technical difficulties prevented him from viewing the home video. (*Id.* at 10). Mr. Tierney swiftly dealt with the issue over the weekend, secured Dr. Lowenstein's verbal representations as to his opinions and anticipated testimony, and then submitted the Rule 16 disclosure to the Government on Monday, May 20, 2019. (*Id.* at 10, 14). Mr. Tierney did not, however, have a written report from Dr. Lowenstein, and therefore drafted the Rule 16 disclosure based solely on what Dr. Lowenstein relayed orally. (Doc. 101 at 3). Dr. Lowenstein did prepare a consulting report in July 2016; however, as the report was based on his review of the forensic interviews only, and as it was targeted towards assisting former counsel in preparing a defense rather than summarizing his anticipated testimony, Mr. Tierney declined to disclose the report to the Government, but stated he would make it available to the Court for *in camera* review. (Doc. 101 at 3-4).

In this Court's Order denying Defendant's motion to withdraw his plea, the Court summarized the July 2016 report as follows:

---

[8] Notably, due to the anticipated extraordinary CJA fees and costs of trying Defendant's case, Mr. Tierney was required to prepare and submit a formal budget for pre-approval. (*See* Docs. 90, 94, 95). This process, and the accompanying administrative requirements, were an unfamiliar departure from the standard excess fees and services procedures. Thus, counsel's efforts to secure CJA funding in this case were considerably more complicated than the typical CJA case.

> Dr. Lowenstein opines in his report that: the minors were "clearly coached" about many of the events they recount during the interviews, as evidenced by their inability to define certain phrases or elaborate on particular allegations; the minors' stories lack credibility due to inconsistencies and their difficulty in recounting events over the span of two interviews; the minors' parents were negligent; and that the interview of the parents was "more of an interrogation," although Dr. Lowenstein conceded that the minors' interviews were "much more adequate." In short, Dr. Lowenstein's opinions are based on nothing more than his <u>plain observations</u> and *personal* judgment.

(Doc. 117 at 3) (emphasis in original).

On May 24, 2019, the Government filed a motion to exclude Dr. Lowenstein's testimony based on non-compliance with Fed. R. Crim. P. 16(b)(1)(C) or, alternatively, to hold a *Daubert* hearing. (Doc. 101). The Government argued that the disclosure was both untimely and substantively inadequate, such that the Government could not be expected to secure and prepare an expert witness to rebut Dr. Lowenstein's overbroad assertions, with only six business days remaining before the commencement of trial. (*Id.*) The Court held a hearing on the Government's motion that afternoon and, after hearing arguments, granted the Government's motion to exclude Dr. Lowenstein's testimony. (Doc. 116).

Following Defendant's guilty plea, Dr. Lowenstein sent a series of letters to Defendant and defense counsel (by that time, Mr. Kidd), in which Dr. Lowenstein propounds the value of his own testimony and criticizes Mr. Tierney's legal advocacy.[9]

---

[9] This Court summarizes the highlights of Dr. Lowenstein's outlandish statements throughout the Court's Order denying Defendant's motion to withdraw his plea. (Doc. 117).

As to the first *Strickland* prong, the Court agrees that a Rule 16 violation occurred and that a witness's testimony was excluded. But the Court also expressly noted that Mr. Tierney had not acted in bad faith with regard to the Rule 16 disclosure and, further, noted that Mr. Tierney is a highly competent lawyer. (Doc. 116 at 24, 29). Mr. Tierney acted with reasonable diligence under the circumstances, but simply ran into hinderances beyond his control (*i.e.*, the pending dispositive motions, the unexpected complication of the CJA budgeting process, and Dr. Lowenstein's three-week delay in even attempting to view the recordings). To be sure, in hindsight, the technical Rule 16 violation could likely have been avoided had counsel started the process months in advance. But it is wholly unreasonable to expect attorneys (particularly CJA counsel) to dedicate time and resources to an issue that may never come to fruition, solely to avoid the possibility that numerous unforeseen delays may occur in the future. Thus, the fact that the delayed disclosure was theoretically avoidable does not render Mr. Tierney's efforts or representation unreasonable, let alone constitutionally deficient.

In any event, Defendant's claim also fails under the second prong of *Strickland*. That is, Defendant suffered no prejudice from the Rule 16 violation.

Even assuming that a witness qualifies as an expert in the area of his anticipated testimony (an issue that was highly debatable with regard to Dr. Lowenstein), the testimony will still be excluded unless it is likely to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

As explained during the hearing on the Government's motion to exclude, and as repeated and emphasized in this Court's Order denying Defendant's motion to withdraw

his plea, the Court's decision to exclude Dr. Lowenstein, while based on a technical

violation of Rule 16, was in no way the only barrier to Dr. Lowenstein's testimony.

In other words, **even if the Court had denied the Rule 16 motion, Dr.**

**Lowenstein would still not have been permitted to testify**.  The Court made this point

abundantly clear in its Order denying Defendant's motion to withdraw his plea:

> [T]he Court accepted counsel's reasonable explanation for the
> delay.  More importantly however, … <u>the Court did not
> exclude Dr. Lowenstein's testimony merely because of the
> timing</u>.  In fact, the Court took considerable issue with the
> admissibility of Dr. Lowenstein's testimony, noting repeatedly
> that the proposed testimony would <u>not</u> assist the jury and that
> its exclusion was <u>not</u> unduly prejudicial to the defense.  (Doc.
> 116 at 16-20).
>
> …
>
> Thus, Defendant is mistaken in his belief that Dr. Lowenstein
> would have testified if defense counsel had disclosed earlier.
> And, frankly, <u>Dr. Lowenstein is wholly mistaken in his belief
> that his testimony was the silver bullet in this case</u>.

(Doc. 117 at 22-23) (emphasis in original).

Nevertheless, Defendant argues that "the effects of [the improper influences] on

the Minors' allegations and trial testimony, could only have been explained to a jury by a

trained, qualified expert, such as Dr. Lowenstein."  (Doc. 135 at 47).  But this Court has

repeatedly held otherwise.

During the hearing on the Government's motion to exclude, the Court stated

repeatedly that Dr. Lowenstein's testimony would not be helpful to the jury, and that his

"findings are based upon, in essence, his observations of <u>what the evidence reflects</u>."

(Doc. 116 at 16-20, 30) (emphasis added).  And the Court's Order denying Defendant's

motion to withdraw re-emphasizes this point, stating: "neither in the disclosure of his anticipated testimony, nor in the 2016 initial report that he himself drafted, nor in any of the subsequent letters that he himself wrote, does Dr. Lowenstein ever make any mention of testifying to subject matter other than what is <u>plainly obvious</u> from the content of the videos."  (Doc. 117 at 24) (emphasis in original).

In other words, in this case, the manner in which the minors' family conducted their questioning, as captured on video recording, is so plainly suggestive that any ordinary citizen would be able to see it—<u>no expert needed</u>.  Moreover, whether the suggestive questioning sufficiently undermined the credibility of the minors' allegations and thus cast reasonable doubt as to the charges in Counts 2 and 3 would have been a question for the jury to decide—again, <u>no expert needed</u>.[10]

Thus, Rule 16 compliance had no meaningful impact on Defendant's ability to call Dr. Lowenstein as an expert witness, and Defendant suffered no prejudice by the exclusion of his proposed expert witness.[11]

Having failed the first and second prongs of the *Strickland* test, the Court finds that Mr. Tierney did not render ineffective assistance of counsel and, accordingly, denies relief under Ground 3.

---

[10] To be sure, a <u>qualified</u> expert may be helpful in other cases, where an examiner uses less obvious forms of suggestive questioning or where the shift in a victim's statement is more subtle. But that was simply not the case here.

[11] Defendant also argues that Mr. Tierney rendered ineffective assistance for not seeking a less severe sanction, such as a continuance, for the Rule 16 violation.  However, as Rule 16 was not the sole determining factor in Dr. Lowenstein's exclusion, no less severe ruling would have been applicable.

#### *4. Failing to Reassert Speedy Trial Rights*

In Ground 4, Defendant asserts that trial counsel was ineffective for failing to "reassert" his speedy trial rights during the intervening period between the hearing on Defendant's motion for reconsideration of dismissal and the issuance of the Court's Order denying reconsideration. (Doc. 135 at 20-21, 55-56).

Defendant's argument fails at the outset because trial counsel did in fact file a motion to dismiss on speedy trial grounds during this time. (Doc. 75). Thus, counsel cannot be deficient for failing to refile a motion that was already filed.

Additionally, Defendant suffered no prejudice from counsel's decision not to file a duplicative speedy trial motion. Specifically, Defendant's speedy trial motion was ultimately denied (Min. Entry, Jun. 19, 2018), and an identical intervening motion would not have changed that fact. Indeed, quite the contrary, another motion to dismiss would have only caused more delay and, critically, would have provided yet another basis upon which to toll time. *See* 18 U.S.C. § 3161(h)(1)(D). Thus, Mr. Tierney's decision <u>not</u> to file another motion was indeed the most practical way to protect Defendant's speedy trial rights.

Accordingly, Ground 4 fails under both prongs of the *Strickland* standard.

#### *5. Failing to Explain Appellate Waiver & Non-compliance with Rule 11*

In Ground 5, Defendant asserts that <u>the Court</u> misled him as to the scope of the plea agreement's appellate waiver. (Doc. 135 at 21-22, 56-57). Specifically, Defendant's plea agreement includes an appellate waiver provision, in which Defendant <u>waives his right to appeal the sentence imposed</u> (unless the sentence exceeds the statutory

maximum), and further <u>waives his right to collaterally attack his conviction or sentence</u>. (Doc. 105 at 3, ¶ 10). However, Defendant's appellate waiver specifically permits Defendant to bring claims of ineffective assistance of counsel or prosecutorial misconduct. (*Id.*)

Defendant now argues that, during the plea colloquy, the Court led him to believe that he could not appeal or collaterally attack his sentence for <u>any</u> reason. (*Id.*) In other words, Defendant asserts that the Court's summarization of the appellate waiver provision was <u>too broad</u>. Defendant claims that, because of this misrepresentation, his plea was not entered knowingly and voluntarily. (*Id.* at 57).

To state the obvious, this is not a true claim of ineffective assistance of counsel, as Defendant's point of contention is with the Court, not counsel. Indeed, Defendant dedicates nearly four-pages in total to this claim and yet the only substantive reference to counsel is in the statement: "Moreover, Mr. Tierney did not explain this language to me." (*Id.*) Thus, to the extent that Defendant's true claim is focused on his plea colloquy, the Sixth Circuit has already ruled, definitively, that Defendant's plea was entered knowingly and voluntarily, and that Defendant is bound by his plea and his appellate waiver. (Doc. 133 at 3-4, 8-10); *Leedy*, No. 21-3573 (Doc. 36, Apr. 19, 2022).

Even construing Defendant's assertion generously as one of ineffective assistance of counsel, Defendant's claim fails.

In the Order denying Defendant's motion to withdraw his plea, this Court held that Defendant's plea of guilty was knowing and voluntary, and the Court detailed the thoroughness of the plea colloquy, specifically noting Defendant's repeated assurances,

under oath, that he had fully discussed every aspect of his case and plea with his attorney and that he was satisfied with the advice of his counsel. (Doc. 117; *see also* Tr. of Plea Hrg., Doc. 110).

However, focusing solely on the appellate waiver, the prosecutor, while summarizing the entirety of the plea agreement in open court, specifically read the entirety of the waiver provision verbatim, including the concluding sentence of the provision, which reads: "However, this waiver shall not be construed to bar a claim by the Defendant of ineffective assistance of counsel or prosecutorial misconduct." (Doc. 105 at 3, ¶ 10; Doc. 110 at 14-15).

The prosecutor further read paragraph 15 of the Plea Agreement, which paragraph encompasses "Defendant's Acknowledgement" as follows:

> **Defendant acknowledges that he has read and understands this plea agreement**; that he **accepts this plea agreement knowingly and voluntarily** and not as a result of any force, threats, or promises, other than the promises in this plea agreement; that he has **conferred with his attorney regarding this plea agreement** and the facts and circumstances of his case, including the applicable law and potential defenses, and that **he is fully satisfied with the representation, advice, and other assistance of his attorney in this case**.

(Doc. 105 at 4, ¶ 15; Doc. 110 at 17) (emphasis added).

Additionally, the paragraph immediately above Defendant's signature line on the plea agreement states:

> I have read this agreement and carefully reviewed **every** part of it with my attorney. I understand it, I voluntarily agree to it, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

28

(Doc. 105 at 5) (emphasis added).

Immediately after the prosecutor summarized the plea agreement, the Court asked

Defendant:

> THE COURT: **You read this Plea Agreement carefully, Mr. Leedy, and discussed it fully with your lawyer before you signed it; is that right?**
>
> DEFENDANT: **Yes**.
>
> …
>
> THE COURT: **And you've discussed all of this fully with your lawyer, Mr. Tierney; is that right?**
>
> DEFENDANT: **Yes, Your Honor.**
>
> THE COURT: Do you believe your lawyer is fully informed about the facts and circumstances on which the charge is based?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: **And are you fully satisfied with your lawyer's advice and representation?**
>
> DEFENDANT: **Regarding this agreement, yes, Your Honor**.

(Doc. 110 at 17-18) (emphasis added)

The Court then proceeded to circle back to individual provisions of the plea

agreement, including, *inter alia*, the appellate waiver provision:

> THE COURT: Section 10, Waiver of Appeal. Do you know what that section means, Mr. Leedy?
>
> THE DEFENDANT: Again, mostly.
>
> THE COURT: What does it mean?

> THE DEFENDANT: I'm waiving my right to appeal to the court of appeals.
>
> THE COURT: Correct.  If you plead guilty and I find you guilty and I sentence you to 30 years, you cannot appeal the case.  You understand that?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: And you've talked with your lawyer about it; correct?
>
> THE DEFENDANT: Yes.
>
> THE COURT: It also says you can't file any attacks on your conviction or sentence collaterally.  That means when you go to the institution, you can't be sending me paperwork saying "I got railroaded" or anything like that.  If I sentence you to 30 years, which is the mandatory minimum, it's over.  And you understand that?
>
> THE DEFENDANT: I understand that.
>
> THE COURT: Very well. **You've talked to your lawyer about it; right?**
>
> THE DEFENDANT: **Yes**.

(Doc. 110 at 20-21) (emphasis added).  While the Court did not specifically delineate the two excepted categories of the appellate waiver provision, Defendant did repeatedly assure the Court that he had carefully read and fully discussed his plea agreement and appellate waiver with his lawyer.  (*E.g., id.* at 17, 20-21).

Additionally, in Defendant's motion to withdraw his plea, Defendant includes, as an attachment, his own sworn affidavit dated December 3, 2019, in which Defendant expressly acknowledges conferring with counsel regarding the appellate waiver (and further demonstrating the nuance with which Defendant comprehended the limitations of

the appellate waiver): "I informed Mr. Tierney that there was no way I would consider any 'plea agreement' without the agreed-upon option to appeal the clear and obvious Sixth Amendment violation. Mr. Tierney contacted the government, and informed me that the government would not agree to allow such an appeal." (Doc. 111-1 at 6). Moreover, at no point in the motion to withdraw his plea (which motion was drafted by subsequent counsel, Mr. Kidd) does Defendant assert that Mr. Tierney failed to explain the appellate waiver provision. (Doc. 111).

Thus, the Court find no credibility in Defendant's assertion that Mr. Tierney failed to explain the appellate waiver.

Additionally, even assuming that defense counsel failed to adequately explain Defendant's appellate waiver—an assertion that this Court finds entirely unbelievable—Defendant has nonetheless suffered no prejudice. Most notably, Defendant timely and immediately appealed his sentence, and timely filed the instant § 2255 collateral attack—all of which belies his assertion that he was misled by the Court and counsel.[12]

Moreover, the (wholly incredible) notion that the appellate waiver was allegedly not explained prior to signing the plea agreement does not mean that Defendant failed to understand the appellate waiver. To that point, on direct appeal, the Sixth Circuit held that: "Nothing in the record suggests that Leedy's assent to the appeal-waiver provision

---

[12] As an aside, even assuming Defendant entered his plea believing that he had no right to appeal or collaterally attack on any grounds, and given that he knowingly and voluntarily entered into such a plea, then Defendant's realization of his own error, in ample time to exercise his rights, would have been a benefit to him. Surely, Defendant cannot be prejudiced by the ability to exercise rights that he previously thought he had waived.

was unknowing or involuntary." (Doc. 133 at 4); *Leedy*, No. 21-3573 (Doc. 36 at 4, Apr. 19, 2022). Indeed, the record is replete with evidence that Defendant read and fully comprehended his appellate waiver provision, and that he knowingly, intelligently, and voluntarily accepted the terms.

For instance, Defendant assured the Court during the colloquy (and the Court agreed) that Defendant was competent and sober during the proceedings, and that Defendant is a fully literate, educated man, having graduated high school and attended some college. (*Id*. at 4-5). And, throughout these proceedings, Defendant has actively submitted *pro se* filings to this Court and the Court of Appeal, amply demonstrating that he is more than capable of reading and understanding not just basic information but complex case law. In fact, there is no better evidence of Defendant's unquestionable ability to read and comprehend the appellate waiver, as well as his full awareness of the scope of the appellate waiver, than Defendant's own *pro se* brief on direct appeal, in which Defendant states:

> Mr. Leedy … retained his right to appeal on the grounds of ineffective assistance of counsel and prosecutorial misconduct.
>
> …
>
> Mr. Leedy's <u>Plea Agreement states, in pertinent part: "Waiver of Appeal: [T]he Defendant waives the right to appeal the sentence imposed ... [h]owever, this waiver shall not be construed to bar a claim by the Defendant of Ineffective Assistance of Counsel or Prosecutorial Misconduct</u>. (Doc. 105 at 3).
>
> **<u>This waiver was also read out loud, word-for-word, for the record by the government at the plea colloquy</u>**. (Doc. 110 at 14,15).

…

> **Clearly**, Mr. Leedy's "ineffective assistance claim [falls] outside the scope of his waiver because his waiver explicitly reserved his right to appeal for ineffective assistance of counsel [and prosecutorial misconduct]." Crawford 730.

*Leedy*, No. 21-3573 (Doc. 28 at 4, Jan. 19, 2022) (emphasis added).

Thus, the Court finds **no credibility** in Defendant's argument that he was left "confused and unaware" by the simple statement: "However, this waiver shall not be construed to bar a claim by the Defendant of ineffective assistance of counsel or prosecutorial misconduct." Nor does the Court find any credibility in Defendant's assertion that defense counsel failed to explain the appellate waiver.

Given Defendant's sworn plea colloquy statements to the Court, representing that he fully discussed the appellate waiver with his attorney, this Court finds no deficiency in counsel's representation. Moreover, as Defendant knowingly, intelligently, and voluntarily agreed to the appellate waiver provision, and timely brought an appeal and filed the instant collateral attack, he has suffered no prejudice.

Accordingly, Ground 5 fails both prongs of the *Strickland* standard.

### 6. Advising a Guilty Plea

In Ground 6, Defendant asserts that trial counsel coerced him into pleading guilty, despite Defendant's desire to proceed to trial. (Doc. 135 at 22-23, 58).

This Court accepted Defendant's guilty plea as knowing and voluntary after a thorough Rule 11 colloquy (Doc. 110), and this Court upheld the validity of the guilty plea in its Order denying Defendant's motion to withdraw his plea (Doc. 117). Further,

the Sixth Circuit has already reviewed the issue and held that Defendant's plea was knowing and voluntary, and affirmed this Court's Order denying Defendant's motion to withdraw his plea. (Doc. 133 at 3-4, 6-11).

Defendant certified in his plea agreement, and swore to this Court during the colloquy, that he was entering his plea knowingly and voluntarily, and not as a result of any force, threats, or coercion. (Doc. 105 at 4, ¶ 15); (Doc. 110 at 17-19, 21, 26-28). Defendant further stated that he was fully satisfied with counsel's advice and representation, particularly as it related to the plea agreement. (Doc. 105 at 4, ¶ 15, 5); (Doc. 110 at 18). Defendant is bound by his statements.

Moreover, Defendant's assertion that his pleas of innocence precluded counsel from advising a guilty plea are entirely without merit. To start, "**defense counsel has the duty to communicate formal offers** from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, 566 U.S. 134, 145 (2012) (emphasis added). Indeed, quite the contrary to Defendant's assertion, it is actually "[a] defense attorney's failure to notify his client of a prosecutor's plea offer [that] constitutes ineffective assistance of counsel under the Sixth Amendment." *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003). Additionally, "declarations of innocence do not prove … that [a defendant] would not have accepted a guilty plea." *Id.* at 738 (citing *North Carolina v. Alford,* 400 U.S. 25, 33 (1970)). Thus, Mr. Tierney was not free to unilaterally disregard the Government's offer simply because Defendant had previously maintained his not guilty plea.

34

And, here, the Government conveyed an offer of 30 years, *i.e.*, the <u>mandatory minimum</u> on one of the three counts charged. Moreover, all three counts carried statutory maximum LIFE sentences, and indeed Counts 2 and 3 were subject to an enhanced recidivist penalty which could have <u>required</u> the Court to impose a life sentence if Defendant were convicted. (Docs. 51 & 87); 18 U.S.C. § 2241(c). Therefore, though the offer of 30 years was by no means an insignificant sentence, it paled in comparison to the LIFE sentence that Defendant faced if convicted on any one of the charged offenses. In other words, it was an offer worth considering.

Additionally, as this Court previously held in denying Defendant's motion to withdraw his plea: "this Court's perception was that [Mr. Tierney] was well-prepared [for trial]. Counsel successfully pursued a number of motions *in limine*, proposed thoughtful jury instruction, and submitted extensive and significant exhibits for trial." (Doc. 117 at 22). Having thoroughly prepared for trial, and as an experienced defense attorney, Mr. Tierney was well aware of the possible trial outcomes, including the likelihood of success, and he accordingly conveyed his experienced advice to Defendant. Mr. Tierney's advice warrants considerable deference, and his decision to convey this advice to his client was entirely appropriate.[13]

As this Court and the Court of Appeals have held, Defendant chose to accept the plea offer he was given, he signed the plea agreement, and entered an entirely knowing

---

[13] As an aside, this Court knows Mr. Tierney to be a skilled attorney and consummate professional. The Court finds no merit in Defendant's further allegations of physical and verbal coercion, and the Court will not entertain such claims further.

and voluntary plea accordingly. Thus, Mr. Tierney's representation with regard to conveying the plea offer was entirely appropriate, and Defendant suffered no prejudice by entering a valid plea pursuant to a favorable plea agreement.

Accordingly, Ground 6 fails both prongs of the *Strickland* standard.

### 7. *Failing to Pursue Issues of Prosecutorial Misconduct & Vindictiveness*

In Ground 7, Defendant asserts that "Mr. Tierney was aware of the numerous instances of prosecutorial misconduct and vindictiveness [as set forth in Grounds 8-12], however, … he failed to pursue any of these issues." (Doc. 135 at 58-59).

First, the issue of prosecutorial misconduct was addressed throughout Defendant's motion to dismiss and his motion for reconsideration, and was specifically addressed and rejected in this Court's Order denying reconsideration. (Docs. 43, 46, 48, 81). Thus, Defendant's assertion that Mr. Tierney "failed to pursue any of these issues," is patently false.

Mr. Tierney raised the issue when he believed it to be appropriate, and this Court rejected the argument. (Doc. 81 at 29-33). Moreover, the Sixth Circuit equally considered and dismissed the assertion of prosecutorial misconduct on Defendant's direct appeal. Defense counsel cannot be faulted for failing to pursue an avenue that had no merit.

As this issue has already been addressed pretrial and before the Sixth Circuit, and as this Court will again emphasize in addressing Grounds 8-12 below, there was no prosecutorial misconduct or vindictiveness in this case. And this Court would not have looked kindly upon any attempt by counsel to make <u>frivolous</u> claims impugning the

36

reputation of an officer of the Court. Thus, Mr. Tierney's decision to not pursue spurious arguments of prosecutorial misconduct was neither erroneous nor prejudicial to Defendant.

Accordingly, Ground 8 fails the first and second prongs of the *Strickland* test.

## B. Prosecutorial Misconduct – Grounds 8 to 12

Defendant further asserts five claims of prosecutorial misconduct, including: (1) "failing to consider plainly obvious exculpatory evidence, and for prosecuting charges that prosecutors knew or should have known were not supported by probable cause"; (2) "failing to correct false testimony"; (3) "misleading the defense and the Court by misrepresenting information regarding destroyed exculpatory impeachment evidence"; (4) "vindictive prosecution"; and (5) "cumulative effect." (Doc. 135 at 23-27, 59-70).

To be clear, the Sixth Circuit has already found no merit to Defendant's prosecutorial misconduct claim. However, as Defendant has attempted to parse out individual instances of alleged misconduct, which instances were not expressly referenced by the Sixth Circuit, the Court will address the arguments, simply for the sake of avoiding any future assertion that Defendant was not fully heard.

### 1. *Failing to Consider Exculpatory Evidence and Pursuing Charges Absent Probable Cause*

In Ground 8, Defendant asserts that the Government prosecuted the case, despite knowing the arrest warrant omitted material information regarding the minors' statements and that the charges were unsupported by probable cause. (Doc. 135 at 23, 59-60).

The Court has already ruled on each of these issues pretrial (and referenced again, *supra*). Specifically, this Court has held that omissions in the warrant affidavit did not undermine probable cause. (Doc. 83). Additionally, this Court held that the allegations of coaching, as well as any inconsistencies in the minors' disclosures over time, did not constitute exculpatory evidence (Doc. 81).

Specifically, in its Order denying Defendant's motion for reconsideration, the Court held that:

> **[T]he Court cannot conclude that the document constitutes "material exculpatory evidence,"** such that the *Trombetta* analysis should apply. Indeed, as Defendant acknowledges, the document's value would have been in undermining the credibility of the Government's potential witnesses—whether the minors, the parents, or Ms. Whittaker—and potentially casting doubt on the reliability of the investigation. However, **even if the document somehow definitively established that the minors were fed information regarding Defendant's prior criminal conduct, that would not prove that the minors' disclosures regarding their own alleged abuses were false**.

(Doc. 81 at 26) (emphasis added).

Ultimately, the suggestive conduct of the minors' parents, and the information that the minors claim to have heard from Ms. Whittaker, were all prime areas of focus for cross-examination, but they were not exculpatory. Moreover, Defendant was duly indicted by the Grand Jury (twice), and he pled guilty to the offense charged in Count 2 of Superseding Indictment. There was no prosecutorial misconduct with regard to the charges.

### 2.  *Failing to Correct False Testimony*

In Ground 9, Defendant asserts that the Government failed in its duty to correct the allegedly false testimony of Dets. Todd and Minnich during the hearing on Defendant's motion for reconsideration of dismissal.  (Doc. 135 at 23-24, 62-64).

The "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'"  *Giglio v. United States*, 405 U.S. 150, 153 (1972).  "To prove that the prosecutor's failure to correct false testimony violated due process rights, [Defendant] must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false."  *Rosencrantz v. Lafler*, 568 F.3d 577, 583-84 (6th Cir. 2009) (citing *Coe v. Bell,* 161 F.3d 320, 343 (6th Cir. 1998)).

Here, Defendant fails, in every respect, to evidence that the testimony of Dets. Todd and Minnich was false, let alone that the prosecutor intentionally presented the testimony and/or failed to correct it.  Specifically, Defendant asserts that:

> [T]he government's agents Todd and Minnich both repeatedly testified falsely that the minors never said that they were told and/or shown "highlighted papers" that provided them the information that I had previously "raped" and "murdered" a child, both repeatedly testifying that the minors only said that they were "shown a picture" of me …. Both Todd and Minnich admitted that they did in fact watch the forensic interviews, but both claimed that they never had a copy of the family video-recorded interview and had not watched it.  Minnich further testified that he knew nothing of the existence of the "highlighted papers" or who would have had those in their possession, until a meeting with Ms. Whittaker in December 2016.  Todd also testified that he alone presented testimony to the Federal grand jury.

(Doc. 135 at 24). However, each of Defendant's representations regarding the testimony is either false or entirely misleading.

The Court will not belabor the point, as the transcript of the hearing is available on the docket. (Doc. 73). However, by way of example, while Defendant claims that the detectives "both repeatedly testified falsely that the minors never said that they were told and/or shown 'highlighted papers,'" Det. Todd simply testified that <u>he could not recall</u> the minors mentioning anything specific being read to them by Ms. Whittaker, but did remember that one of the minors mentioned being shown a document that included Defendant's picture and sex offender status. (*Compare* Doc. 135 at 24, *with* Doc. 73 at 93, 133). Similarly, Det. Minnich testified that <u>could not recall</u> any mention of a highlighted document, but he recalled Minor Two stating that he was shown a picture of Defendant. (Doc. 73 at 150). Det. Minnich further recalled Minor Two stating that Defendant was a sex offender, but did not believe Minor Two disclosed how he knew this information. (*Id.*)[14]

Additionally, Defendant falsely claims that Dets. Todd and Minnich "both claimed that they never had a copy of the family video-recorded interview and had not watched it." (Doc. 135 at 24). However, Det. Minnich actually testified that the minors' mother initially provided the video recording to a Detective Petit of the Fairborn Police Department, and further testified that he obtained a copy from Det. Petit in January or February 2016, and that he watched the video upon receiving it. (Doc. 73 at 146-48).

---

[14] Notably, during the interview, Minor 2 does not refer to Ms. Whittaker or any caseworker by name, instead referring to "her who was over there" or "this other girl." (*See* Doc. 81 at 11, f. 4).

Indeed, during his testimony, Det. Minnich specifically commented on the content of the video and noted the improper technique that the parents employed when questioning the minors. (*Id*. at 149). Thus, only Det. Todd testified that he never watched the video recorded by the minors' parents. (*Id*. at 112-13). Notably, however, the video was recorded late-December 2015, and Det. Todd specifically testified that he had less involvement in the case after December 2015 when the FBI and Det. Minnich became involved. (*Id*. at 115).

Additionally, Defendant claims that "Todd also testified that he alone presented testimony to the Federal grand jury," but Det. Todd made no such statement. The only testimony even close to what Defendant claims was Det. Minnich stating that he was out of town when the Grand Jury convened and indicted Defendant in 2016, and therefore he did not testify, "it was just Detective Todd." (*Id*. at 154-55).

Needless to say, Defendant's representations regarding the testimony are inaccurate.

More importantly, Defendant provides no evidence to support his argument that Dets. Todd and Minnich's testimony was false. Nor does Defendant provide any explanation as to why those statements were material. Indeed, unless one of the detectives had admitted during the hearing to intentionally destroying material, exculpatory evidence, their testimony would not have changed the outcome of Defendant's motion.

Ultimately, this Court presided over the evidentiary hearing and had the opportunity to see and hear the testimony firsthand. The Court had no doubt then, and

41

has no doubt now, that Dets. Todd and Minnich testified truthfully and to the best of their recollections. Defendant presents no evidence to the contrary. Thus, the Court finds that no "false testimony" was presented, and the prosecutor had no duty to correct anything.

Accordingly, Ground 9 fails.

### 3. *Misleading the Defense and Court Regarding Spoliation of Evidence*

In Ground 10, Defendant asserts that the Government intentionally misled the defense and the Court with regard the spoliation of evidence, resulting in unnecessary motion practice and undue delays. (Doc. 135 at 24-26, 65-66). Specifically, Defendant argues that "the prosecution knew or should have known, through its agent, Det. Minnich, that the documents [the defense] requested in May 2016 were destroyed in December 2015 …, but nevertheless made repeated and continual misrepresentations to the defense about the documents' existence …." (Doc. 135 at 66).

This assertion is patently false and indeed was expressly rejected in this Court's Order on Defendant's motion for reconsideration. Indeed, as plainly established during the motion hearing, and as stated in the Court's Order, neither AUSA Muncy, nor Det. Minnich, had any knowledge that the document was destroyed until December 9, 2016. (Doc. 81 at 21, Doc. 73 at 160-61). At best, Det. Minnich began to suspect that the document may no longer exist after a meeting with the prosecutor and defense counsel on November 29, 2016 (*i.e.*, less than two weeks before receiving confirmation on December 9, 2016). But, regardless, at no point did AUSA Muncy ever make misleading claims that the document existed after learning that it had been destroyed. Nor could

AUSA Muncy or Det. Minnich be expected to know this information under the circumstances that presented in this case.[15]

Thus, Ground 10 is entirely without merit.

### 4. Vindictive Prosecution

In Ground 11, Defendant asserts that the Government acted vindictively in superseding the Indictment to add an additional count, less than two weeks after learning that evidence had been destroyed and just two days after Defendant filed his motion for reconsideration of dismissal. (Doc. 135 at 26, 66-69).

"[D]ue process prohibits an individual from being punished for exercising a protected statutory or constitutional right." *United States v. Poole*, 407 F.3d 767, 774 (6th Cir. 2005) (citing *United States v. Goodwin*, 457 U.S. 368, 372 (1982)). However, "the Due Process Clause is not offended by all possibilities of increased punishment …., but only by those that pose a realistic likelihood of 'vindictiveness.'" *Blackledge v. Perry*, 417 U.S. 21, 27 (1974).

Thus, "[a] defendant alleging prosecutorial vindictiveness must show either 'actual vindictiveness' or a 'realistic likelihood of vindictiveness.'" *United States v. Roach*, 502 F.3d 425, 443 (6th Cir. 2007) (quoting *United States v. Dupree*, 323 F.3d 480, 489 (6th Cir. 2003)). "Actual vindictiveness is demonstrated by 'objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights.'" *Id.* (quoting *Dupree*, 323 F.3d at 489). Conversely, to show a 'realistic likelihood of

---

[15] The circumstances leading up to the destruction of the documents is detailed in this Court's Order denying reconsideration. (Doc. 81 at 6-22). The Court will not restate the facts here.

vindictiveness,' the defendant must show: "(1) exercise of a protected right; (2) the prosecutor's 'stake' in the exercise of that right; (3) the unreasonableness of the prosecutor's conduct; and, presumably, (4) that the prosecution was initiated with the intent to punish the [defendant] for the exercise of the protected right." *Dupree*, 323 F.3d at 489.

If the defendant shows that "'the prosecutor has some stake in deterring the [defendant's] exercise of his rights and [that] the prosecutor's conduct was somehow unreasonable,' then the Court may find that there is a 'reasonable likelihood of vindictiveness' and may presume an improper vindictive motive." *United States v. LaDeau*, 734 F.3d 561, 566 (6th Cir. 2013) (quoting *Bragan v. Poindexter*, 249 F.3d 476, 482 (6th Cir.2001)). "The government bears the burden of rebutting the presumption with 'objective, on-the-record explanations' such as 'governmental discovery of previously unknown evidence' or 'previous legal impossibility.'" *Id*. (quoting *Bragan*, 249 F.3d at 482).

Here, Defendant presents no <u>objective</u> evidence that the Government's decision to supersede was intended to punish Defendant for exercising his legal rights, and thus Defendant cannot claim actual vindictiveness. *See Roach*, 502 F.3d at 443. The Court must consider, however, whether there is a "realistic likelihood of vindictiveness." *Id*.

In that regard, Defendant's pursuit of discovery and his decision to file a motion to dismiss based on spoliation (though unsuccessful), was unquestionably an exercise of his rights. But Defendant has not and cannot evidence that the Government's decision to

supersede was intended to deter Defendant from exercising his rights, nor that the decision was unreasonable or intended as punishment.

As to the Government's stake in deterring Defendant—the Government superseded after Defendant had filed a motion to compel discovery, a motion to dismiss, and a motion for reconsideration, and after the Government had already undertaken an arduous process to track down the discovery. If the Government intended to deter Defendant, surely it would have acted on that impulse sooner. Moreover, if, as Defendant often claims, the Government knew in advance that the requested documents had been destroyed (which it did not), then the Government most certainly would have sought to deter any further requests immediately. More to the point, however, Defendant fails to explain how superseding the Indictment, to add a serious charge, would deter him from pursuing his discovery request as to the other counts. In short, the Government had an interest in bringing an additional charge, but that interest does not equate to having a stake in deterring Defendant from exercising his right to discovery or to litigate his case.

As to reasonableness of the Government's decision, the Court notes that the original Indictment was obtained after Defendant's arrest on the most recent allegations involving Minors 1 and 2. Given the limited passage of time at that point, the evidence as to those charges was undoubtedly going to be easier to compile and present to the Grand Jury. Moreover, while investigators and the Government may have known of the conduct that ultimately became Count 1 of the Superseding Indictment, what they knew and what could evidence are entirely distinct. Notably, the conduct charged in Count 1 of the Superseding Indictment was alleged to have occurred between January 1, 1999, and

June 1, 2001. It would have unquestionably been more difficult and time consuming (and possibly futile) to chase down what was likely to be a literal paper trail of evidence and to contact and interview the victim, John Doe (who by then was a grown man and did not reside in the area), then it was to bring the case as to Minors 1 and 2 before the Grand Jury. Moreover, any notion that the Government should have nevertheless waited to charge all counts together is unreasonable, given that investigators believed Defendant was responsible for sexually abusing at least four young children (counting Defendant's gross sexual imposition conviction from 2002). Thus, the Court finds nothing inherently unreasonable about the notion that the Government would proceed on the evidence they had and supersede later with the John Doe charge.

Moreover, the Court finds nothing unreasonable about the timing of the Superseding Indictment (*i.e.*, two weeks after learning that Defendant's requested discovery items had been destroyed and two days after Defendant filed his motion for reconsideration of dismissal).

To start, the Court cannot conclude that Defendant's motion for reconsideration prompted the Government to supersede. Specifically, Defendant filed his motion for reconsideration on December 19, 2016, at 4:27 p.m. (*See* Notice of Electronic Filing, Doc. 48). The Grand Jury returned the Superseding Indictment on December 21, 2016. (Doc. 51). It is highly improbable that the Government was able to prepare, schedule, and present its case to the Grand Jury within one business day. Thus, if the timing of the Superseding Indictment was more than coincidental, it was more logically prompted on

46

December 9, 2016, when the Government learned that the impeachment documents were destroyed.

In that regard, the Court still finds nothing unreasonable about the timing. That is, the Government had the right to add a charge, and it may have been motivated do so after learning that there could be some evidentiary issue with the charges that were initially brought. That is not to say that the destruction of the evidence was fatal to the Government's case—as this Court ruled (and has repeatedly referenced, *supra*), it was not. But every evidentiary issue is another hurdle for the Government at trial, and there is nothing vindictive about bringing a <u>legitimate</u> charge that does not carry the same burdens.

The Court would further note that, contrary to evidencing vindictiveness, the Government's decision (if intentional) to not supersede earlier may in fact speak to its attempts to not pile on charges, not complicate the case further, and not drag in another victim who may very well have moved on with his life.

In short, the fact that the Government may have superseded out of necessity does not render the decision unreasonable nor evidence vindictiveness.

Finally, there is no evidence that the Superseding Indictment was intended as any form of punishment in response to Defendant's motion practice. As previously explained, there are a number of reasons why the Government may not have brought the additional charge immediately, and a number of reasons why the Government chose its moment to supersede. But prosecuting a case is the Government's job—it is not a personal vendetta against Defendant.

47

Accordingly, Defendant's claim of vindictiveness fails.

### 5. *Cumulative Effect*

In Ground 12, Defendant argues that "the prosecutorial misconduct so infected this case with unfairness as to deny [him] of [his] constitutional right to due process." (Doc. 135 at 70. However, as this Court, and the Sixth Circuit, have found no merit to any claims of prosecutorial misconduct, Defendant's assertion as to the cumulative effect is meritless.

### C. Ineffective Assistance of Appellate Counsel – Ground 13

Finally, Defendant asserts one claim of ineffective assistance of appellate counsel for "failing to raise and develop prosecutorial misconduct claims" on appeal. (Doc. 135 at 27, 70). Defendant alleges that this failure denied the Court of Appeal of the opportunity to consider all of his prosecutorial misconduct claims. (*Id*.)

The *Strickland* standard, articulated *supra*, applies equally to a claim of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Thus, Defendant must show both deficient performance and resulting prejudice. *Strickland*, 466 U.S. at 688, 694. And, specifically, to prevail under the "prejudice" prong of *Strickland*, Defendant "must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal." *Robbins*, 528 U.S. at 285.

As this Court has already explained, *supra*, and as the Sixth Circuit concluded, Defendant's claims of prosecutorial misconduct lack merit. Thus, appellate counsel cannot be faulted for failing to identify a wholly frivolous claims. Indeed, appellate

counsel's obligation in filing an *Anders* brief is to "refer[] to anything in the record that might arguably support the appeal." *Anders v. California*, 386 U.S. 738, 744 (1967).

That said, the Court acknowledges that it would have been wise for appellate counsel to include the issue of prosecutorial misconduct in his *Anders* brief (and fully recognizes that the Sixth Circuit took umbrage with its omission). However, for purposes of the highly deferential *Strickland* standard, it is entirely plausible that counsel reviewed the extensive briefing on the trial court's docket and concluded that a prosecutorial misconduct claim simply lacked any semblance of credibility (as this Court and, ultimately, the Sixth Circuit also concluded). *See, e.g., Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) ("the process of 'winnowing out weaker arguments on appeal' is 'the hallmark of effective appellate advocacy'") (quoting *Smith v. Murray,* 477 U.S. 527, 536 (1986)). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Monzo*, 281 F.3d at 579 (quoting *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986)). And, here, the prosecutorial misconduct claim was not stronger than the issues counsel identified (*i.e.*, denial of Defendant's motion to withdraw and the validity of the appellate waiver).

In short, while the Court recognizes that the *Anders* brief should have included prosecutorial misconduct for good measure, appellate counsel's decision to omit the issue does not meet the standard of constitutionally deficient performance under *Strickland*.

However, even assuming *arguendo* that appellate counsel's omission meets the first *Strickland* prong, Defendant's claim fails as to the second prong.

To start, after appellate counsel filed his *Anders* brief, Defendant was expressly advised that he now had the opportunity to file his own *pro se* appellate brief and to raise any issues he chose—an opportunity which Defendant had requested at the outset of the appellate proceedings and reiterated after appellate counsel moved to withdraw. Nevertheless, Defendant failed to take the opportunity (even after being granted an extension of time, and even after submitting a responsive brief, two supplemental briefs, a notice of correction, and a number of *pro se* communications), to raise any of the prosecutorial misconduct claims that he now faults appellate counsel for failing to argue.

Defendant also assumes that the Sixth Circuit's review of his prosecutorial misconduct claim was limited by appellate counsel's omission. However, the Sixth Circuit's Order addressed the heart of Defendant's prosecutorial misconduct claim (*i.e.*, the spoliation of impeachment material), and then repeatedly states that the appellate court reviewed the record as a whole and found no meritorious issues on appeal. (Doc. 133). Moreover, by chastising appellate counsel for failing to include prosecutorial misconduct in the *Anders* brief, the Sixth Circuit demonstrated that it recognized and intended to give proper consideration to the issue. Finally, that appellate counsel was granted leave to withdraw, that Defendant was denied the appointment of new counsel, and that the case was dismissed after the Sixth Circuit's thorough review of the prosecutorial misconduct issue, all demonstrate that appellate counsel's omission in his *Anders* brief, and his decision to forego pursuing the prosecutorial misconduct issue on appeal, were ultimately harmless.

Defendant fails to show that he was prejudiced by the omission of the prosecutorial misconduct claims in the context of an *Anders* brief or on appeal. Accordingly, Defendant's ineffective assistance of appellate counsel claim fails.

## IV. CONCLUSION

Based upon the foregoing, Defendant's motion to vacate his conviction and sentence, pursuant to 28 U.S.C. § 2255 (Doc. 135) is **DENIED**.

**IT IS SO ORDERED.**

Date: 5/16/2023

Timothy S. Black
United States District Judge